**ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al.,**
**Plaintiffs,**

v.

**Howard H. CALLAWAY et al.**
**Defendants.**

**Civ. A. Nos. 74–1190, 74–1191.**

United States District Court,
District of Columbia.

Sept. 6, 1974.

---

16. *See* N.Y.U.C.C. § 4–201(1) (McKinney 1964).

Joseph V. Karaganis, Jon T. Brown, Sanford R. Gail, Joseph D. Feeney, Jr., Chicago, Ill., for plaintiffs.

Irwin Schroeder, Jr., Washington, D. C., Atty., Dept. of Justice, E. Manning Seltzer, Gen. Counsel, Army Corps of Engineers, Washington, D.C., for defendants; Fred R. Disheroon, Asst. Gen. Counsel, Corps of Engineers, Washington, D.C., of counsel.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on Plaintiff's Motion for a Preliminary Injunction to prevent the Defendants from constructing a 3.2 billion dollar Upper Mississippi River Navigation System and its first component, Locks and Dam 26, located at Alton, Illinois.

On August 6, 1974 two actions were filed in this Court by the Izaak Walton League of America, et al. and the Atchison, Topeka and Santa Fe Railway Company, et al.[1] against Howard H. Callaway, Secretary of the Department of the Army, the Army Corps of Engineers, and Lieutenant General William G. Gribble, Chief of Engineers, Department of the Army. On the same day, United States District Judge Howard F. Corcoran issued a temporary restraining order prohibiting the letting of bids for the proposed Locks and Dam 26. On August 20, 1974, this Court granted the Plaintiffs' Motion to Consolidate the two cases and a hearing was held on the Motion for a Preliminary Injunction. This Court is now faced with the important task of deciding questions of national importance in that they involve a substantial environmental, economic, and social impact upon the entire inland waterway system of the midwestern United States, and the manner by which similar projects in other parts of the nation will be handled in the future by Congress and the Army Corps of Engineers.

## I. BACKGROUND

Locks and Dam 26 is one of a series of locks and dams extending from Alton, Illinois to St. Paul, Minnesota. Together, these twenty nine locks and dams make commercial traffic possible on the Upper Mississippi River and the Illinois Waterway. Locks and Dam 26, however, as the Defendants have recognized, is the pivotal crossroads of this river complex. This is because it is the first locks and dam to the Upper Mississippi River and serves as the gateway of all commerce. This is not an overstatement. Locks and Dam 26 is a key intersection affecting the total inland waterway sys-

1. The other Plaintiffs consist of twenty, midwestern railroads, the Sierra Club of America, and the Illinois branch of the Isaak Walton League.

tem of America's breadbasket. All traffic from the Upper Mississippi River and Illinois Waterway must pass through these locks on its way west on the Missouri River, east on the Ohio River, and south on the Lower Mississippi River.[2]

2. The following map from the Final Environmental Impact Statement on Locks and Dam 26 shows the Mississippi Inland Waterways System and the proposed project site at Alton, Illinois. See page 613 for map.

Mississippi River Inland Waterways System and Gulf Intracoastal Waterway.

The existing Locks and Dam 26 was originally authorized by Congress in the 1930's and was operational by 1938. At the present time, it has fallen into an alleged state of deterioration. In 1968, in recognition of the condition of the structure, a report prepared by the Army Corps of Engineers was submitted to the Board of Engineers for Rivers and Harbors and the Secretary of the Army recommended that a new structure, located two miles downstream, be built to replace the existing facility. Agency approval was given in 1969, and in 1970 Congress appropriated funds for planning. A Survey Report and a General Design Memorandum were prepared, followed by a Draft Environmental Impact Statement. In 1974, a Final Environmental Impact Statement was released. And, after hearings before both the House and Senate Subcommittees on Appropriations (Public Works), Congress, on August 15, 1974, appropriated over twenty-two (22) million dollars for the project.[3] This money, say the Defendants, will go to the construction of a coffer dam,[4] the first major step toward the building of a new Locks and Dam 26. This will take over nine months. The entire structure will not be completed for at least eight years, although the Defendants admit that it will probably be closer to eleven years before the entire facility is operational.[5] The total cost of the project has been estimated by the Defendants to be over 383 million dollars.[6]

## II. ISSUES

The gravamen of the Plaintiffs' claim is that the proposed Locks and Dam 26 is merely the first step in a multibillion dollar project to rebuild the Upper Mississippi River System without specific authorization from Congress in violation of 33 U.S.C. § 401.[7] Specifically, the Plaintiffs maintain that the Army Corps of Engineers intends to rebuild the entire system because 1.) the dramatic increase in size and capacity of the new Locks and Dam 26 will so affect the other structures that it will necessitate their rebuilding, 2.) the life expectancy of the entire system, not just Locks and Dam 26, is nearing its end, and 3.) the Corps in other documents, specifically the Upper Mississippi River Comprehensive Basin Study of 1970 (Appendix J), has indicated that the building of a new Locks and Dam 26 will require numerous other structures, or modification of existing structures, in order to cope with the increased capacity.

Plaintiffs further claim that the Army Corps of Engineers has violated Section 209 of the Rivers and Harbors Act of

---

3. This appropriation was part of a general appropriations bill passed by the House of Representatives on August 13, 1974 and by the Senate on August 15, 1974.

4. A coffer dam is an enclosure from which water is pumped thereby exposing the bottom of the river to permit construction.

5. *See*, Final Environmental Impact Statement, Locks and Dam 26, at 3 (i. ii. i.).

6. Id., at 2, 11.

7. Section 401 provides that:
It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army:
*Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.

1970,[8] in that the Corps 1.) ignored the objectives of national economic development and environmental protection, 2.) improperly and inadequately assessed the benefits and costs of the project and, 3.) failed to consider feasible alternatives. Coupled with the above claim, Plaintiffs allege that the Army Corps of Engineers has also violated Section 122 of the Rivers and Harbors Act of 1970[9] by not examining possible adverse economic, environmental, and social effects of the project. And, finally, the Plaintiffs assert that the National Environmental Policy Act of 1969 (hereinafter NEPA)[10] has been abridged because the Army Corps of Engineers has insufficiently analyzed and assessed the environmental impact of the proposed Locks and Dam 26 and the system-wide rebuilding. It is Plaintiffs claim that the Corps has illegally attempted to segment the system so as to facilitate its justification and to hide its true intent to rebuild the system from the Congress and the public. Furthermore, Plaintiffs state that the Corps has transgressed the mandates of NEPA by: failing to disclose the data used to prepare the Environmental Impact Statement (hereinafter EIS), thereby impeding public and Congressional scrutiny of the project, using unrealistic and outdated data and thereby rendering the EIS analysis and assessment arbitrary and capricious and because it fails to analyze alternatives or their environmental impact.

The Defendants contest these claims and allege that the proposed rebuilding of Locks and Dam 26 does not need the consent of Congress, but rather is specifically permitted by 33 U.S.C. § 5.[11] The Defendants, in the alternative, maintain that even if Section 5 were found to be inapplicable, recent Congressional appropriations are sufficient, albeit implied, authorization for a new Locks and Dam 26. The Defendants strongly protest that this is not a multibillion dollar project encompassing numerous structures, but rather, is singular in nature, even though they admit that other projects are being considered. In response to the alleged violations of Sections 122 and 209 of the Rivers and Harbors Act of 1970, the Defendants argue that Section 122 is inapplicable because the project was authorized prior to the enactment of the statute thereby exempting the project from its requirements and that, regardless of this technicality, the Corps has given adequate treatment to the factors contained in Sections 122 and 209.

The Defendants also dispute the claimed violations of NEPA on the grounds that the plaintiffs have not borne their burden of proving a lack of reasonable, good faith compliance and

---

8. 42 U.S.C. § 1962–2.

9. Pub.Law 91–611, 84 Stat. 1823 (1970).

10. 42 U.S.C. § 4321 et seq.

11. 33 U.S.C. § 5 provides in pertinent part that:

[F]or the purpose of preserving and continuing the use and navigation of said canals and other public works without interruption, the Secretary of the Army, upon the recommendation of the Chief of Engineers, United States Army, is authorized to draw his warrant of requisition, from time to time, upon the Secretary of the Treasury to pay the actual expenses of operating, maintaining, and keeping said works in repair, which warrants or requisitions shall be paid by the Secretary of the Treasury out of any money in the Treasury not otherwise appropriated: *Provided,* That whenever, in the judgment of the Secretary of the Army, the condition of any of the aforesaid works is such that its entire reconstruction is *absolutely essential* to its efficient and economical maintenance and operation as herein provided for, the reconstruction thereof may include such modifications in plan and location as may be necessary to provide adequate facilities *for existing navigation:*

*Provided further,* That the modifications are *necessary to make the reconstructed work conform. to similar works previously authorized by Congress* and forming a part of the same improvement, and that such modifications shall be considered and approved by the Board of Engineers for Rivers and Harbors and be recommended by the Chief of Engineers before the work of reconstruction is commenced . . . . (Emphasis added)

that the EIS is sufficient because the alleged omissions were considered and discussed in an appropriate manner and because the Corps had a right to omit certain information as beyond the scope of reasonable concern.

## III. DISCUSSION

A. THE PROPOSED LOCKS AND DAM 26 AT ALTON, ILLINOIS, REQUIRES THE CONSENT OF CONGRESS UNDER 33 U.S.C. § 401 AND MAY NOT BE BUILT WITHOUT AUTHORIZATION UNDER 33 U.S.C. § 5.

In order to decide whether Congressional consent is required, the relationship between 33 U.S.C. §§ 5 and 401 must be examined and understood. Under the latter Section, Congressional consent is required before the commencement of construction of *any* dam or other structure in a navigable river of the United States.[12] The word *any,* in regard to this case, is crucial. On its face, Section 401 would appear to prohibit the building of any structures, even by the Federal government, without prior Congressional approval. However, Section 5 permits the Army Corps of Engineers to entirely reconstruct a dam or other structure, that is to build a dam or other structure in place of an existing structure, without the consent of Congress when, due to its condition, reconstruction is "absolutely essential" to its efficient and economical maintenance and operation, and further permits the Corps to make modifications in plan and location as "may be necessary to provide adequate facilities for existing navigation." Thus the word *any* in Section 401 is qualified by Section 5, to the extent that the criteria of

Section 5 are met. A critical distinction can, therefore, be drawn between reconstructing under Section 5 and what may be characterized as rebuilding under Section 401, the latter term being a designation for those replacement structures which do not meet the criteria of Section 5.

The Defendants would have this Court hold that since the present Locks and Dam 26 is considered by the Corps to be obsolete, its replacement is within the ambit of Section 5, requiring no specific authorization.[13] This argument hinges on the word "existing" in Section 5. It is the Defendants' contention that this term encompasses future traffic needs since it would be illogical for Congress to allow for a structure that would be obsolete on the drawing board. While this Court agrees that Congress did not legislate planned obsolescence, the agency's position must be rejected as there are compelling reasons that it is wrong. *See,* Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 479 F.2d 842, 865 (1973).

What the Defendants have failed to appreciate is the consequence of their position. If the Army Corps of Engineers can replace any existing structure merely because it considers it to be obsolete, then not only would there be no distinction between Sections 5 and 401, but also there would be raised the specter of an unlawful delegation of legislative power. The plain meaning of Section 5 prohibits this Court from adopting the Defendants' interpretation. Section 5 is essentially a maintenance provision. *It does not give the Corps a right of replacement in perpetuity.*[14] Section 5 permits a reconstruction only when it is "absolutely essential", and

---

12. While the original purpose of Section 401 was to assert the federal power over the nation's waterways so as to prevent obstructions to navigation by states and private parites, it has been held to apply to the Federal government. *See,* United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935).

13. The Defendants maintain that the facility must be considered obsolete because it is experiencing structural deterioration and has reached its capacity to adequately serve the present and future traffic needs of the Upper Mississippi River System.

14. Cf., Northwest Paper Co. v. F. P. C., 344 F.2d 47, 50–51. (8th Cir. 1965).

only allows a modification in plan and location when it is necessary to meet the needs of "existing" navigation. The clear meaning of the Section is that the Corps may *replace* a structure which has become ineffective or damaged, but may not *rebuild* a structure merely to meet expected future increases in traffic. In essence, only Congress can authorize such a project.[15]

The Defendants argue that Section 5 should be given a broader interpretation. They contend that this is possible if the word "existing" is interpreted to include future traffic. The word "existing" in the statute, however, connotes the present and not the future. This is its plain meaning and there is no legislative history to the contrary. Although this may appear to the Defendants as unduly restrictive, when Section 5 is read in conjunction with Section 401, it is apparent that all the Corps has to do to build a new structure to replace one that has allegedly become obsolete is to obtain the consent of Congress. It is understandable that Congress reserved such a decision to itself as in many instances it would entail, as does the instant matter, considerations which would substantially affect the environment, the economy, and the society of the nation. The Corps has admitted that this is "the largest construction project in the history of the mid-west." EIS at 138. It is impossible for this Court to believe that Congress would permit the decision to proceed to be made by the Corps and not by Congress.

It must be recognized that there is a discernible line between *reconstructing* and *rebuilding*. It can be ascertained by determining whether the proposed structure represents a material change in the character and capacity of the existing structure. In the case of Gulf, C. & S. F. Ry. Co. v. Meadows, 56 Tex.Civ.App. 131, 120 S.W. 521, 524 (1909) a Texas court stated:

> Appellant in its pleadings and brief claims that it was repairing an old bridge, but the truth of the matter is that it tore down an old wooden bridge, and placed in its stead a new steel structure. It was engaged in the construction of a new bridge, as much so as though no other bridge had ever spanned the river. It would not matter when the original bridge was constructed, whether before or after the enactment of the federal statute, when it undertook to erect a new bridge of different construction and different material, it was subject to the provisions of [Section 401].

Thus it may be said that one of the basic factual questions in this case is whether the proposed structure is one of *"wood"* or one of *"steel"*. Since this is on motion for a preliminary injunction, the Plaintiffs must show that there is a likelihood that they will prevail on the merits in their contention that the proposed structure is of the latter type.

---

15. The Commission on Organization of the Executive Branch has been critical of the Corps' expanded interpretation of Section 5. Commenting on a project similar to the proposed Locks and Dam 26, the Commission stated:

"The Locks proposed to be installed are not replacements, but constitute a new navigation improvement program for these rivers. The Ohio River project currently contemplates the replacement of 9 dams having locks of low lift by 3 dams having locks of lift equivalent to the existing 9. Although the project channel depths are authorized for 9 feet, the new locks will provide for at least 12-foot depths. The issue which we raise is not as to the engineering soundness of the project, but as to the authority of the Corps of Engineers to proceed without specific authorization. No decision of a court or opinion of the Department of Justice is cited to support the construction of this statute. While the statute authorizes the Corps of Engineers to replace or reconstruct obsolete or worn-out works, it is stretching it too far to find in it authority to proceed with such programs as are contemplated on the Ohio and Warrior-Tombigbee."

## B. THE PLAINTIFFS HAVE SHOWN A LIKELIHOOD THAT THEY WILL PREVAIL ON THE MERITS UNDER SECTION 401.

■ As previously stated, the standard for determining if the proposed Locks Dam 26 is a reconstruction or a rebuilding is whether the proposed structure represents a material change in the character and capacity of the existing structure. The Plaintiffs have adduced sufficient evidence to convince this Court that it is likely that they will prevail on their allegation that the Defendants have violated 33 U.S.C. § 401.

■ First, the Plaintiffs have clearly shown, and, the Defendants have admitted, that the character and capacity of the proposed Locks and Dam 26 will be substantially increased. The present "practical capacity" of the existing structure is 46.2 million tons.[16] The proposed structure will accommodate 190 million tons.[17] While the design of the new structure will be similar to the existing one, the depth and dimensions will be increased to create a greater "practical capacity".[18] There is, however, a dispute as to the depth of the channel. The Corps maintains that it will be nine feet[19] whereas other agencies and the Plaintiffs claim that it will be twelve feet.[20] While this Court is willing to accept the Corps representations, it is cognizant of the fact that the twelve foot channel has been and still is under considerations.[21] And, as the record reveals, the character of the proposed structure makes it amenable to such a change.[22]

Second, the Plaintiffs have met their burden on the issue of whether this is a singular or systemic rebuilding. This Circuit has refused to accept *post hoc* rationalizations of agency action and will scrutinize the record to determine its true intention. See, Scientists Inst. For Pub. Info., Inc. v. A. E. C., 156 U.S.App. D.C. 395, 481 F.2d 1079, 1095 (1973). While in its representations to the Congress and in its responses to comments in the Final EIS the Corps rejected the contention that it is undertaking a system-wide improvement project, the record is replete with contrary indications.

In the Final EIS the Corps has conceded that: "Few water resource projects compare in scope and extent with this project, and its construction must be considered a major expenditure of public funds."[23] The Defendants maintain that this refers only to the proposed Locks and Dam 26. While this is arguable, its meaning is illuminated by the following statement from the Draft EIS:

"There are at present some constraints to the realization of this prediction in that other locks in the system would be overloaded before such tonnages could be reached. Thus, considering the impact of the project under existing conditions—that is, utilizing the other existing locks and dams in the system—the tonnages that could be shipped on the upper Mississippi River and Illinois River would be constrained to present capabilities of other locks in the system. To be able to carry the amount of cargo forecast will necessitate al-

16. EIS at 3.

17. *Id.* at 4.

18. *Id.* at 5, 136–37. "Practical capacity", as this Court understands the term, means the amount of traffic, in tons, that can pass through the Locks without undue delay in the course of one year.

19. The Defendants point specifically for support to the discussion at page 137 of the EIS.

20. The Plaintiffs, in support of their contention, emphasize, *inter alia*, that the General

Design Memorandum No. 2 proposal was for a twelve foot channel. GDM at 2–1. Further, they point to the letter of Assistant Secretary of the Interior Nathanial P. Reed, dated August 5, 1974, to Secretary of the Army Howard H. Callaway, which reveals Interior Department concern that the Corps intends to construct an unauthorized twelve foot channel.

21. EIS at 14.

22. *Id.* at 137–38.

23. *Id.* at 179.

teration or replacement of other locks and dams in the system.

The construction of replacement Locks and Dam No. 26 will, therefore, create impetus to revise other portions of the system to create the most efficient utilization of the added capacities of Locks and Dam No. 26." [24]

Upon a thorough reading of the EIS and the General Design Memorandum No. 2 (hereinafter GDM), this Court has found even subtler indications too numerous and complex to recount. An example will suffice. In Exhibit 15, Sheet 4 of the GDM appears a conclusion that the twenty-one foot depth of the proposed lock chamber will provide for a twelve-foot navigation channel. But, to the contrary, in the EIS it is stated that a twenty-one foot depth in the lock chamber is insufficient to accommodate continuous traffic which requires a twelve-foot navigation channel, although such traffic could be passed through the locks with some delay. The Corps would have this Court conclude that the twelve-foot channel has therefore been rejected and that no system-wide improvements to such effect are contemplated by the proposed Locks and Dam 26. This contention is unworthy of belief in light of the following reasons. First, most of the traffic at present and in the near future does not require a twelve-foot channel. Second, those that do would not disrupt the flow of commerce to such an extent that the proposed structure must be considered an isolated improvement. And, third, as this Court has already noted, the structure is conducive to the eventual accommodation of continuous traffic requiring a twelve-foot channel. Furthermore, the Plaintiffs have also shown that they are likely to prevail upon their contention that the proposed Locks and Dam 26 is not "ab-

solutely essential". The record reveals that while the existing structure may be said to be deteriorating, "remedial measures have been accomplished to correct the more serious deficiencies." [25] And, more importantly, it has been shown that the existing structure can be refurbished so as to extend its life for fifty years at an estimated cost of 100 million dollars, [26] compared to the 383 million for the new structure. The Corps claims that a new structure is still absolutely essential because of the present delays in passing traffic through the Locks. These present delays, however, have been shown to be easily remedied.[27]

Upon a careful examination of the voluminous record presented to date in this case, it is the conclusion of this Court that the Plaintiffs have successfully demonstrated that they are likely to prevail upon their contention that the proposed Locks and Dam 26 is in violation of 33 U.S.C. § 401.

C. THE PROPOSED LOCKS AND DAM 26 HAS NOT BEEN AUTHORIZED BY CONGRESS EVEN THOUGH CONGRESS HAS APPROPRIATED FUNDS FOR THE PROJECT.

As this Court has found that the Defendants cannot rely on 33 U.S.C. § 5, the issue remains whether Congress has approved the proposed rebuilding of Locks and Dam 26.

The Defendants argue that because Congress has appropriated funds for the project, it has therefore given its consent. The Defendants, however, in the hearings before Congress and in all of their public documents, including the EIS, have continually asserted that this is a Section 5 project which does not need specific congressional authorization.[28] What in essence the Defendants

---

24. Draft EIS at Three–18. A similar statement appears in the GDM at A–17.

25. EIS at 3.

26. Id. at 150. The capacity, however, would remain at its present level.

27. See, Affidavit of Dr. Joseph L. Carroll. The true concern of the Corps is the future delays created by the existing structure.

28. See, Statements of Colonel Hall before the Senate Subcommittee of the Committee on Appropriations, October 13, 1969, p. 6803; EIS at 2; GDM at 1–1.

now argue is that Congress ignored these assertions and authorized the project under Section 401. Such a contention is not only unpalatable, but is also erroneous as a matter of law. While some legislators did question under which statute the Defendants were proceeding,[29] they had a right to rely on the Defendants representations that this was a Section 5 project. For, legislators voting for appropriations have the right to assume that the agency had been following and will follow the law. *See*, E. D. F. v. Froehlke, 473 F.2d 346, 355 (8th Cir. 1972).

■ This Court cannot agree that the mere appropriation of funds meets the statutory requirement for Congressional consent under Section 401.[30] It is a general principle that Congress cannot and does not legislate through the appropriation process. This principle has been codified in Rule XXI of the Manual of the House of Representatives, which provides in pertinent part:

> 2. No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless on continuation of appropriations for such public works or projects as are already in progress.

Thus, an authorization bill would be necessary at the least for Congressional consent under Section 401. And, Locks and

Dam 26 would not come under the exception since it is not a project already in progress. On this point, House Rule § 836 must also be considered:

> Previous enactment of items of appropriation unauthorized by law does not justify similar appropriations in subsequent bills unless if through appropriations previously made a function of the government has been established which would bring it into the category of continuation of works in progress.

Furthermore, the fact that no point of order was raised to the recent appropriation is not indicative of authorization, nor on the basis of § 836 can the previous appropriations provide such an indication. Therefore, this Court concludes that the proposed Locks and Dam 26 does not have the "consent" of Congress under 33 U.S.C. § 401.[31]

### D. THE DEFENDANTS HAVE VIOLATED THE ENVIRONMENTAL POLICY ACT OF 1969, 42 U.S.C. § 4321 ET SEQ., BY NOT PREPARING A "DETAILED STATEMENT" ENCOMPASSING THE SYSTEMATIC IMPACT RESULTING FROM THE REBUILDING OF LOCKS AND DAM 26.

■ The National Environmental Policy Act of 1969, 42 U.S.C. § 4332 requires that agencies of the Federal government consider the impact of an overall program and not just isolated aspects of facilities.[32] A restricted impact anal-

---

**29.** *See*, Statement of Senator Allen J. Ellender, Chairman, Subcommittee of the Committee on Appropriations, October 13, 1969, at 6802–3.

**30.** The Defendants' reliance on Orlando v. Laird, 443 F.2d 1039 (2d Cir. 1971) is misplaced. Although the Second Circuit did reject the appellant's contention that "congressional authorization (for the Viet Nam war) cannot, as a matter of law, be inferred from military appropriations," it held that the manner by which Congress declared was a political question. Id. at 1043. Moreover, this Court can find no support for the Defendants' position that appropriations are sufficient authorization in this matter in the *Laird* opinion.

**31.** This Court is also of the opinion that 42 U.S.C. § 1962d–5 may not have been complied with in this matter. That Section requires that *any* water resource development project over ten (10) million dollars (first cost) be approved by resolutions of the Committees of the House and Senate on Public Works. The parties have not shown that such resolutions were or were not passes. However, since this Court has found that Section 401 has not been complied with, a determination of this issue is not necessary for a decision on the motion for a preliminary injunction.

**32.** *See*, Scientists, Institute for Public Information v. A. E. C., 156 U.S.App.D.C. 395, 481 F.2d 1079, 1086–1087 (1973).

ysis is prohibited because it "would frustrate the vitality of NEPA by allowing piecemeal decisions."[33] Thus, an agency may not engage in segmentation, i. e. "an appraisal of each tree to one of the forest."[34]

A bone of contention in this case has been whether the rebuilding of Locks and Dam 26 represents the first step in a system-wide improvement of the Upper Mississippi River and the Illinois Waterway. While it has already been found that the Plaintiffs are likely to prevail upon this assertion, there is an additional reason why this Court must conclude that the Defendants have been guilty of segmentation.

■ ■ The concept of segmentation encompasses more than prohibiting the mere artificial division of the program, it also requires that the Courts guard against an agency's considering only the immediate impact of the first step in a program.[35] The intent of Congress was to have NEPA effect the earliest deliberations of proposed actions.[36] Therefore, even though future action has not been finalized, if it is envisioned then the agency must consider the impact of subsequent actions in furtherance of the program. In the instant case, the proposed Locks and Dam 26 will provide for more than a tripling of the amount of traffic on the Upper Mississippi and the Illinois Waterway. Yet, the Final EIS includes an analysis of only the immediate and local impact of the project. This is so despite the fact that the Corps concedes that due to the increased capacity of the proposed structure other locks and dams in the system will require at least modification or rebuilding. This Court must therefore conclude that the Defendants have violated NEPA by failing to prepare a detailed statement encompassing the systematic impact resulting from the rebuilding of Locks and Dam 26.

This is not to say that the Corps must prepare a complete impact statement now for all future action that it intends to take in furtherance of the program. Rather, the Corps must identify and analyze the environmental impact the proposed structure and increased traffic will have on the entire Upper Mississippi River system and Illinois Waterway. The Defendants, however, argue that studies are being performed on this subject, and that on the basis of present information it is believed that there will be little risk of environmental damage, and that unexpected environmental effects from increased traffic can be controlled or eliminated. While this may be true, none of this was included in the EIS and, more importantly, none of the data on which these statements and conclusions are based is set forth in the EIS for congressional and public scrutiny. What the Defendants fail to comprehend is that the rule against segmentation requires government agencies to recognize the interrelationship of environmental effects at the formative stage.[37]

The Defendants argue that even though there may be a cumulative environmental impact, segmentation is permissible since Locks and Dam 26 meets the test set forth in the recent case of Sierra Club v. Callaway, 499 F.2d 982, 1974. (Wallisville Project). The Fifth Circuit Court of Appeals in determining whether the Wallisville Project was a component, increment or first segment of the larger Trinity River Project, stated that the issue of segmentation should be decided on a case by case basis considering the factors of the scope of the project, the timing of the project, and the interdependence of the project to the

33. Sierra Club v. Froehlke, 359 F.Supp. 1289, 1323 (S.D.Tex.1973).

34. Jones v. Lynn, 477 F.2d 885, 891 (1st Cir. 1973).

35. See, Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167, 1170 (S.D.Iowa 1972).

36. See, Scientists Institute, supra, 481 F.2d at 1087–1088.

37. Id.

overall program. While these are not the only factors to consider in this case, upon an application of the factors set forth in the Wallisville case, this Court finds that Locks and Dam 26 is not susceptible to a segmented analysis.

First, the Corps has stated openly that the proposed Locks and Dam 26 is the largest project undertaken in the midwest and will cost over 383 million dollars—a major expenditure of public funds to say the least. The decision to expand the capacity of this part of the Upper Mississippi River Navigation System, which includes the Illinois Waterway, from 46 to 190 million or more tons is, in essence, the decision to expand the capacity of the entire system. It is this decision that will necessitate the improvement of other segments of the system. Thus, Locks and Dam 26 is to the other parts of the Upper Mississippi system what the Trinity River Project is to the Wallisville Project, not visaversa.

Second, the proposed Locks and Dam 26 is just on the verge of implementation as opposed to the Wallisville Projects which is near completion. Despite this fact, the Defendants argue that this case is similar to Wallisville in that not only has Congress not appropriated funds for the other segments but also they will take at least fifty years to complete. And, they add that segmentation in this case is essential because the structural integrity of the existing Locks and Dam 26 is in doubt making it a priority project. This Court is not persuaded that these are sufficient reasons to allow segmentation. While it is true that Congress has not appropriated funds, the proposed structure, as the Corps admits in the Final EIS, will necessitate system-wide improvements. Further, the rebuilding of Locks and Dam 26 itself will take approximately a decade, and will therefore require that the existing structure be maintained until it will be replaced. The Corps implores that they be allowed to replace the structure and will later examine its systemic impact. This is exactly what NEPA seeks to prevent.

While this Court has sufficiently dealt with the question of interdependence in its discussion of the previous issues, one further comment is necessary. This Circuit, in Scientists Institute, *supra*, 481 F.2d at 1087, noted that:

> Individual actions that are related either geographically or as logical parts in a chain of contemplated actions may be more appropriately evaluated in a single, program statement.

This perception is particularly applicable in this case. Although it is conceivable that no further improvements of the Upper Mississippi River system may occur, the fact that improvements are expected requires a present evaluation of their future impact.[38] This Court cannot allow the Defendants on the one hand to segment the project and ignore the systemic impact and on the other cite as the justification for the increased capacity of the proposed structure the need for expansion of the capacity of the entire system.

E. THE DEFENDANTS HAVE VIOLATED NEPA BY FAILING TO ADEQUATELY CONSIDER ALTERNATIVES TO THE PROPOSED ACTION AND BY FAILING TO DISCLOSE ESSENTIAL DATA

▆ In order to determine whether the EIS demonstrates an adequate assessment of alternatives to the proposed action, this Court has sought to ascertain the primary purpose of the project.[39] Although the Defendants have

---

38. If this Court were to scrutinize the proposed Locks and Dam 26 in a vacuum, then it would have to conclude that the Plaintiffs are likely to prove that the environmental injury so outweighs the benefits of the expanded structure as to make the agency's decision to proceed arbitrary and capricious.

39. *See*, Sierra Club v. Froehlke, 359 F.Supp. 1289, (S.D.Tex.1973).

focused upon the deteriorating condition of the existing structure so as to bring the project within 33 U.S.C. § 5, it is the conclusion of this Court that the primary purpose is to expand the facility's capacity to meet the expected increase in traffic on the Upper Mississippi River and Illinois Waterway.[40]

Even though the primary purpose is expansion, the EIS restricted its consideration of alternatives to "no action", different types of construction, and changes in location.[41] The only references in the EIS to the possibility of other modes of transportation meeting the expected increase in traffic of goods are the conclusory statements that: railroads and other forms of transportation could not handle the increase in traffic of goods, especially grain, would require greater public investment, would cost more to shippers, would, by stifling industrial growth, have an adverse economic and social effect on the region, and would require greater energy consumption in light of the projected availability of fuels.[42]

While this Court is not in a position to agree with or dispute the merits of these conclusions, neither is the Congress nor the public since the data on which they were based and the agency's reasoning process were not included in the EIS. This is contrary to the policy of NEPA, which has been called an "environmental full disclosure law." E. D. F. v. Corps, 325 F.Supp. 728, 759 (E.D. Ark.1971). What the lack of disclosure in this case does is to prohibit review by masking the reasons upon which the initial choice has been made between rebuilding or relying on existing structures and alternative modes of transportation. This is a clear violation of NEPA. See, Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.C.Conn. 1972).

Upon an examination of the EIS, this Court must conclude that it fails to adequately consider feasible alternatives. It is apparent to this Court that this is another case in which the agency has limited its consideration to only those alternatives that it can adopt. See, N. R D. C. v. Morton, 148 U.S.App. D.C. 5, 458 F.2d 827 (1972). Such violations of both the letter and spirit of NEPA can not be tolerated.

F.  THE ALLEGED VIOLATIONS OF SECTIONS 209 AND 122 OF THE RIVERS AND HARBORS ACT OF 1970 ARE COGNIZABLE BY THIS COURT.

As it has been found that the proposed Locks and Dam 26 has not been authorized by Congress, this Court holds that Section 122 of the Rivers and Harbors Act of 1970 does apply to the proposed project. However, since the requirements of Sections 122 and 209 are similar to those of NEPA,[43] it is unnecessary at this stage in the proceedings to examine in depth the Plaintiffs' allegations in this respect as this Court has found NEPA to have been violated.

G.  THE INJUNCTION MUST ISSUE AS FEDERAL STATUTES HAVE BEEN VIOLATED AND THE PLAINTIFFS HAVE SHOWN LIKELIHOOD OF SUCCESS AND IRREPARABLE HARM.

When, as in the present case, federal statutes have been violated, it has been the long standing rule that a court should not inquire into the traditional requirements for equitable relief. See, United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). While this Court is bound by that rule, there are other compelling reasons that the injunction should issue.

---

40.  An examination of the entire record reveals that this is the avowed purpose. For example, see EIS at 4. See also, Upper Mississippi River Comprehensive Basin Study (1970) Table J–32.

41.  See, EIS at 149–170.

42.  Id. at 150–52.

43.  See text accompanying notes 8 and 9.

First, this Court is concerned with the analytical harm to NEPA.[44] The Congressional policy underlying that statute is that agencies which propose major federal action consider the national environmental and societal interest. Since NEPA has been violated, this Court cannot allow the proposed Locks and Dam 26 project to proceed until the agency properly determines the reasonable alternatives, and thus where the national interest lies.

Second, the Plaintiffs have shown not only that they are likely to succeed on the merits but also that they will suffer irreparable harm which outweighs any injury the Defendants would bare. If the proposed project is not consented to by Congress, then the injury to the environment, which the Defendants admit will occur, will be needless. Further, the Plaintiffs Railroads, being already in a tenuous financial position, would be unnecessarily harmed, perhaps even collapse, if the unauthorized expansion of the Upper Mississippi River and Illinois Waterway is allowed to proceed.

And finally, this Court is sensitive to the fact that the public interest lies with both parties. On the one hand, the public is concerned with maintaining the environment as well as the existence of the numerous midwestern railroads, and on the other, with the traffic delays and structural integrity of the existing Locks and Dam 26 as well as the free flow of commerce up and down the Upper Mississippi River and Illinois Waterway. Moreover, the public is concerned with the economic and social effect on the region. Having considered these interests, it is the opinion of this Court that the injunction must be granted. The project will be delayed only until the Defendants obtain the consent of Congress and cure the defects in the EIS. This will take a relatively short period of time considering that just the building of the new Locks and Dam 26 will take at least a decade, and until then the existing structure will have to be maintained.

An order in accordance with the foregoing has been issued.

---

44.  *See,* Jones v. D. C. Redevelopment Land Agency, 499 F.2d 502 (D.C.Cir.1974).