ENVIRONMENTAL DEFENSE FUND, INC., Committee for Leaving the Environment of America Natural, Glenn H. Clemmer, G. Randall Grace, and F. Glenn Liming, Plaintiffs,

National Audubon Society, Birmingham-Audubon Society, and the Alabama Conservancy, Intervening Plaintiffs,

v.

Clifford R. ALEXANDER, the United States Army Corps of Engineers, and Major General John Morris, Defendants,

Tombigbee River Valley Water Management District, Tennessee-Tombigbee Waterway Development Authority, State of Alabama, and Tombigbee Valley Development Authority, Intervening Defendants.

LOUISVILLE AND NASHVILLE RAILROAD, Plaintiff,

National Audubon Society, Birmingham Audubon Society, and the Alabama Conservancy, Intervening Plaintiffs,

v.

Clifford R. ALEXANDER, the United States Army Corps of Engineers, and Major General John Morris, Defendants,

Tombigbee River Valley Water Management District, Tennessee-Tombigbee Waterway Development Authority, State of Alabama, and Tombigbee Valley Development Authority, Intervening Defendants.

Nos. EC 77–53, 77–54–K.

United States District Court,
N. D. Mississippi, E. D.

March 12, 1979.

H. M. Ray, U. S. Atty., Oxford, Miss., Hunter M. Gholson, Columbus, Miss., for Tennessee-Tombigbee Waterway Development Authority.

Ralph Pogue, Aberdeen, Miss., for Tombigbee River Valley Water Management Dist.

Jerry L. Weidler, Asst. Atty. Gen., Montgomery, Ala., for State of Alabama.

Jon T. Brown, Stephen E. Roady, Duncan, Brown, Weinberg & Palmer, Washington, D. C., William A. Butler, Environmental Defense Fund, Washington, D. C., James T. B. Tripp, Environmental Defense Fund, New York City, Joseph V. Karaganis, Chicago, Ill., for Environmental Defense Fund, Inc.

William Robertson, U. S. Army Corps of Engineers, Atlanta, Ga., Ken Powers, Dept. of the Army Corps of Engineers, DAEN–CCK, Washington, D. C., David H. Webb, Asst. Dist. Counsel, Mobile Dist., Army Corps of Engineers, Mobile, Ala., for Army Corps of Engineers.

Barbara A. Babcock, Dept. of Justice, Glenn V. Whitaker, Edward Christenbury, Lewis K. Wise and Lawrence Moloney,

Civil Division, Dept. of Justice, Washington, D. C., for Dept. of Justice.

Joseph L. Lenihan, Louisville, Ky., for Louisville & N. R.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In 1971 a group of environmentalists challenged the validity of the Tennessee-Tombigbee Waterway (TTW), a navigational project in Alabama and Mississippi which Congress authorized in 1946. The original complaint, asserting six causes of action for alleged violation of various statutes, was dismissed with prejudice by the district court. *EDF v. Corps of Engineers*, 348 F.Supp. 916 (N.D.Miss.1972). The Fifth Circuit on appeal affirmed, 492 F.2d 1123 (1974), and certiorari was not sought.

Now, six years later and after the project is estimated to be about 29% complete and Congress has appropriated almost $600,000,-000 toward the construction of the waterway, the project has again been challenged in a broad-scale attack by a coalition of environmentalists and a railroad. Some plaintiffs in the present action were parties in the prior litigation, i. e., Environmental Defense Fund, Inc. (EDF), the Committee for Leaving the Environment of America Natural (CLEAN), and a plaintiff class of individuals aggrieved or detrimentally affected by TTW. Those parties are now joined as plaintiffs by Louisville & Nashville Railroad (L&N) and three plaintiff-intervenors, National Audubon Society, Birmingham Audubon Society and the Alabama Conservancy. The principal defendants, as before, are the Secretary of the Army, the Chief of Engineers, and the United States Corps of Engineers (Corps), and parties who have intervened as defendants are Tombigbee River Water Management District, Tennessee-Tombigbee Waterway Development Authority, State of Alabama and Tombigbee Valley Development Authority.[1]

By this present complaint, plaintiffs assert fifteen causes of action which may be reduced to three primary areas of judicial concern:

1. Plaintiffs contend in Counts I and II that the Corps lacks legal authority to construct the TTW, as it is doing, with a 300' wide navigational channel and other structures requiring major changes in design.

2. In Counts III and V, plaintiffs challenge the Corps' method of calculating costs and benefits as legal justification for continuance of the project by including therein benefits to be derived from major changes in channel width, cut offs and new lock structures of the Warrior-Tombigbee Waterway, a separate project whose improvement has not received congressional authorization. This established navigation project extends from the Port of Birmingham on the Warrior River (known as Black Warrior River from its source to Tuscaloosa and from Tuscaloosa to Demopolis known as Warrior River) (BWT), where it joins the Tombigbee and continues south to the Port of Mobile.

3. The plaintiffs challenge again the Corps' compliance with various environmental statutes, principally the National Environment Policy Act (NEPA), 42 U.S.C. § 4321, et seq., and the Fish and Wildlife Coordination Act, 16 U.S.C. § 661, et seq.[2]

---

1. Unless the context requires otherwise, reference to plaintiffs will encompass all parties plaintiff, including plaintiff-intervenors, and reference to defendants will include all parties defendant, including defendant-intervenors.

2. Other causes of action are as follows:

Count IV charges noncompliance with the Water Resources Development Act of 1974, 42 U.S.C. § 1962d–17 by the Corps' use of an interest rate of 3¼% in its calculations of costs and benefits rather than 6⅝% currently required under regulations promulgated by the Water Resources Council.

Count VI charges violation of 33 U.S.C. § 701–1 by constructing the TTW with full knowledge that the project does not possess a positive benefit/cost ratio.

Count VII charges the Corps with violating its own regulations as well as NEPA, §§ 122 and 209 of the River and Harbor Act of 1970, and the principles and standards of the Water Resources Council by making a secret 1975 study in which alternatives were not disclosed

By their answers, the defendants deny all violations of law and assert that the TTW is being constructed in accordance with law and the Corps' regulations. In addition, defendants plead res judicata, collateral estoppel and laches in bar of the various causes of action now raised by plaintiffs.

After extensive discovery, defendants moved for judgment on the pleadings or, in the alternative, for summary judgment on the principal issues raised by the complaint. Plaintiffs submitted a cross-motion for summary judgment directed, basically, to the authorization, economic and environmental questions. Each motion for summary judgment was accompanied by copious affidavits, depositions and other evidentiary materials which, in our judgment, render the case, which is admittedly of a complex nature, incapable of summary disposition.

Therefore, the court calendared for full evidentiary hearing a basic claim raised for the first time in this litigation, not within the scope of the original complaint and hence not adjudicated in the prior action; namely, the legality of TTW as constructed by the Corps since 1971 because the Corps is allegedly exceeding the physical dimensions of the legally authorized project and making other design changes in excess of authority. Indeed, in the initial litigation plaintiffs stipulated that the authorized

bottom width for the project was 300' except in the actual divide cut, where the authorized width was 280'. Neither did the plaintiffs challenge that the plan provided for lock chamber dimensions of 110 × 600' and that authorized depths were 9' in the river section and 12' in the canal and divide sections. It is upon these physical aspects of the waterway, together with the substitution of a chain of lakes concept for a perched canal in the canal section, that plaintiffs mount their main attack upon the sufficiency of congressional authorization for the waterway. Although plaintiffs in the former case raised no issue as to what were the legally authorized dimensions of the TTW, nevertheless, the question is of basic importance, transcending all others which plaintiffs now assert. If TTW, as it is being constructed, is not a legally authorized project, all other issues are mooted until such time as proper authorization may be obtained from Congress. The authority of the Corps, therefore, to construct the TTW in accordance with the present, ongoing plan is fundamental to a proper determination of the case.

## I.

### (a) *Nature of the TTW Project.*

After previous adverse reports, the original survey of the TTW is found in House

---

to Congress or the public, and by adopting a 300' wide channel for the TTW.

Count VIII charges that the Corps assumed the authorized existence of a 300' channel in the BWT south of Demopolis, and upon discovery that such was not authorized by Congress, the Corps arbitrarily segmented into two parts a project from Pickwick Pool in the Tennessee River to Demopolis with a 300' wide channel and with plans to later secure authorization for the BWT channel south of Demopolis, duplicate locks, in order to sustain their prior calculation of a positive benefit/cost ratio.

Count IX charges that the Corps secretly prepared and filed General Design Memorandum (GDM) of components of the project without preparing or circulating Environmental Impact Statements (EIS) and without detailed disclosure and participation required by NEPA and the Corps' regulations.

Count X charges that the Corps, after identifying numerous adverse environmental and economic impacts, has failed to prepare and distribute a supplemental EIS as required by

NEPA and § 122 of the River and Harbor Act of 1970.

Count XI complains that the Corps makes annual requests for congressional appropriations without the preparation of accompanying EIS.

Count XII charges the Corps with violating the Clean Water Act of 1977 by failure to file a detailed EIS with Congress prior to the discharge of dredged spoil in contravention of the regulations of the Environmental Protection Agency (EPA) governing dredging activities.

Count XIII charges that the project violates the requirements of the Fish and Wildlife Coordination Act, 16 U.S.C. § 662.

Count XIV charges that the Corps has failed to publish governing documents in the Federal Register, thereby violating the Administrative Procedure Act, 5 U.S.C. § 552(a).

Count XV invokes § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, to hold the Corps' actions as arbitrary, capricious and otherwise not in accordance with law and in excess of statutory authority.

Document 269, 76th Cong., 1st Sess., where the Chief of Engineers, on February 27, 1939, reported to Congress for the Rivers and Harbors Board of Engineers, recommending

> that the United States undertake the construction of a waterway to connect the Tennessee and Tombigbee Rivers, by way of the East Fork of the Tombigbee River, Mackeys Creek, and Yellow Creek, so as to provide a channel of not less than 9 feet in depth and a minimum bottom width of 170 feet in river and canal sections and 115 feet in the divide cut, with locks approximately 75 by 450 feet clear inside dimensions, substantially in accordance with the general plan presented in the report. .

House Document 269 is a detailed analysis of the then existing navigation projects affecting the TTW·and of the present and prospective commerce derived from navigation on the TTW.[3] It reported that the "improvement desired is a navigable waterway of dimensions which would permit modern barge-line operation between the Tennessee and Tombigbee Rivers." H. Doc. 269, ¶ 20, p. 16. It was recommended that the plan be divided into three parts, namely: the river section 180 miles in length, the canal section 41 miles in length, and the summit or divide cut 30 miles in length, with the dimensions of the channel width, depth and locks to be as above stated. Id. ¶ 30, p. 18. These dimensions were recommended since the 75 by 450′ lock could take care of an "economic standard tow [consisting] of five 35 by 145 foot barges and a towboat," and the "channels would be adequate to provide for double lane navigation for the standard tow, assuming 8-foot draft." Id. ¶ 32, 33, p. 19; see also ¶ 113, 114 and 115, p. 68.

The foregoing recommendations were approved by Congress, with modifications, by House Document 486, 79th Cong., 2nd Sess., adopted January 2, 1945. In view of the growth of the bargeborne traffic during intervening years, that document

led the Board of Engineers for Rivers and Harbors to conclude that maximum economy for the proposed waterway can be attained by the provision of channels and locks with somewhat larger dimensions than have hitherto been recommended for a project connecting the Tombigbee and Tennessee Rivers. The Board's reexamination of prospective navigation requirements has occasioned fundamental revisions in the design of structures contemplated within the general plan of improvement. (H. Doc. 486, ¶ 2, p. 2).

The movement of waterway traffic from Mobile to Paducah over the Tombigbee-Tennessee waterway is obviously one for which no actual carrier costs can be obtained. To establish an average cost based on operations under similar conditions on other waterways, it has been assumed as typical that the through traffic of this section will be carried in 8-barge tows handling 3,500 revenue tons, pushed by 1,000 horsepower towboats. (Id. ¶ 66, p. 25.)

The locks . . . are 110 feet by 600 feet with 13 feet over the lower miter sills. These dimensions were chosen so that tows now moving on the connecting waterways, Warrior-Tombigbee, Tennessee, Ohio, Mississippi, Missouri, and Illinois Rivers, could utilize the connection without double tripping through the locks, thus the economics inherent in the movement of commodities in large-sized tows would be available to the commerce prospective for movement through the Tombigbee-Tennessee waterway. (Id. ¶ 106, p. 40).

In general, the waterway would have a project depth of 9 feet with 1 foot overdepth and a bottom width of at least 170 feet. In the divide cut, . . . a width of 150 feet with passing places 200 feet wide at least every 4 miles would be provided. The project depth in the divide

---

3. A House Document in waterway projects generally encompasses the recommendations of Corps officials with respect to a specific project and is, by reference, incorporated into the authorizing legislation. See *United States v. 2606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286 (5 Cir. 1970).

cut . . . would be 12 feet with 1 foot overdepth . . .. The passing places would each be 1,000 feet long and 200 feet wide . . .. These passing places would all be located so that they could be utilized as part of a broader channel if it were desired to widen the cut at some future date. (Id. ¶ 109, p. 41).

The Board recognized that the estimates contained in H. Doc. 269 were "largely out of date" because of sweeping changes brought about since the country's involvement in war, and that

> [t]ransportation facilities of every kind have been taxed almost to capacity. . . Consequently, it has been necessary to . . . canvass the latest and most reliable sources of information on the past, present, and probable future flow of traffic, in order to predict with confidence the type and size of facilities required and the function of the proposed project in the pattern that will be assumed by postwar commerce. (Id. ¶ 138, p. 52).

The Board recommended that the United States undertake the construction of the TTW waterway along the route previously designated

> so as to provide a channel of not less than 9 feet in depth and a minimum bottom width of 170 feet in river and canal sections and 150 feet in the divide cut, with locks 110 by 600 feet clear inside dimensions. (Id. ¶ 147, p. 55).

TTW was thus designed as a navigational project for two-way barge traffic to connect the north-flowing Tennessee River with the south-flowing Tombigbee River so as to provide a continuous waterway from the Tennessee, upper Mississippi and Ohio Valleys to the tidewater Port of Mobile on the Gulf of Mexico. The territorial limits of the TTW, however, extended northward from Demopolis, Alabama, on the existing canalized BWT, a separate navigation project, upstream via the Tombigbee River, East Fork of the Tombigbee, Mackeys Creek, with a deep cut through the divide · into Yellow Creek, then to the Pickwick Pool in the Tennessee River near the com-

mon boundary of the states of Tennessee, Alabama and Mississippi. The original overall project length—Demopolis to Pickwick Pool, corrected by cutoffs—was 260 miles.

H. Doc. 486 provided, among other things, that the plan of improvement investigated presupposes the construction of the new authorized lock and dam at mile 218.1 upstream from Mobile, near Demopolis, Ala., with normal upper pool at elevation 74.13 and a lock chamber 110 by 600 feet and with 13-foot depth over the lower miter sill. (Id. ¶ 102, p. 34).

H. Doc. 486 discussed the plan of the project's operation in the following terms:

> The function of the canal and its connections as a through route between the Gulf of Mexico and the Ohio, upper Mississippi, Missouri, and Illinois Rivers involves the construction of a canalized channel and locks of standard dimensions, to permit the transit of tows of normal size without breaking formation. The plan assumes the replacement of existing locks 1 to 7 on the Warrior-Tombigbee waterway as planned in House Document 56, Seventy-third Congress, and House Document 276, Seventh-sixth Congress, as warranted improvements of the existing Warrior-Tombigbee waterway. (Id. ¶ 136, p. 51).

(b) *The Authorizing Legislation.*

The waterway was congressionally authorized by Pub.L.No.79–525, 79th Cong., 2d Sess., enacted July 24, 1946, and reads as follows:

> That the following works of improvement of rivers, harbors, and other waterways are hereby adopted and authorized to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated:
>
> . . .
>
> Tombigbee and Tennessee Rivers, Alabama and Mississippi; House Document Numbered 486, Seventy-ninth Congress.

House Doc. 486 was thus incorporated by reference into the authorizing statute. The Chief of Engineers, in submitting the report, recommended approval of the project

substantially in accordance with the general plan presented in this report with such modifications thereof as in the discretion of the Secretary of War may be advisable. House Doc. 486, Report of Chief of Engineers, p. 3.

(c) *Existing Navigation Projects Having Relationship to TTW (as of 1946).*

House Document 486 discussed the relationship of the TTW with connecting waterways in terms as follows:

A connection via the proposed route would afford an additional means of interchange of commerce between the Gulf Intracoastal and the Warrior-Tombigbee waterways on the one hand, and the Tennessee, Ohio, and Mississippi River systems on the other. . . . The Gulf Intracoastal Waterway is a sea-level channel dredged through bays, sounds, coastal lakes, and canals. These channels have minimum project dimensions of 125 feet in width and 12 feet in depth. The authorized projects for the Warrior-Tombigbee waterway, the Tennessee, the Ohio, the Missouri, and the Mississippi Rivers provide for depths of at least 9 feet. The port of Mobile is connected with the Gulf of Mexico by a dredged channel 32 feet deep and about 30 miles long through Mobile River and Mobile Bay. (H. Doc. 486, ¶ 5, p. 5).

*Warrior-Tombigbee Waterway—*

The Warrior River is formed by the confluence of the Locust and Mulberry Forks about 20 miles west of Birmingham, Ala., and flows southwestwardly 178 miles, entering the Tombigbee River just above Demopolis. From its source to Tuscaloosa, Ala., a distance of 47 miles, the river is known as the Black Warrior River and from Tuscaloosa to Demopolis it is known as the Warrior River. Throughout this report the term "Warrior" will be understood to cover both sections of the river. . . . Below Tuscaloosa the project

on the Warrior-Tombigbee waterway provides for a year-round channel 9 feet deep and 200 feet wide to be secured by the construction of a series of locks and dams. (Id. ¶ 6).

*Tennessee River—*

The Tennessee River is formed by the confluence of the Holston and French Broad Rivers near Knoxville, Tenn., and flows southwestward to a point on the Alabama State line near the Georgia boundary. From there it crosses into Alabama and flows westward across the northern part of the State to the intersection of the Alabama, Mississippi, and Tennessee boundaries; thence it turns northward across Tennessee and Kentucky and empties into the Ohio River at Paducah, Ky. . . . The Tennessee Valley Authority has provided a comprehensive development for navigation, power, and flood control. A series of 10 locks and dams provides a year-round 9-foot navigation channel with a standard 2-foot overdraft to Knoxville. In the construction of locks 110 by 600 feet on the Tennessee River, provision was made for the future construction of auxiliary locks 60 by 360 feet, and in the construction of locks 60 by 360 feet, provision was made for the future construction of locks 110 by 600 feet.

Report of Board of Engineers for Rivers and Harbors, p. 5–6, House Document 486.

(d) *Post-Legislative Occurrences (1950–67).*

In 1951, as a result of a report by the investigative staff of the House Appropriations Committee, the TTW, the plans of which were then only partially completed, was placed in a "deferred-for-restudy" category. The essence of the investigative report was that the dimensions specified in the 1939 and 1946 House Documents, other than provision for 110 by 600' locks, were inadequate for 2-way navigation of 8-barge tows, and the Chief of Engineers should submit cost estimates for a 300' channel throughout pursuant to the Corps' ultimate plan. (Plt.Ex. 85). General Pick, Chief of Engineers, took issue with the criticism for

the Corps' not submitting estimates of costs for developing a waterway with a 300′ channel throughout, while providing for larger locks and a wider divide cut. On April 23, 1951, he advised the Appropriations Committee:

> The Corps of Engineers has not recommended a 300 foot waterway and would never so recommend unless there developed sufficient traffic to justify the cost of increasing channel dimensions. The Tennessee-Tombigbee Waterway is authorized for a width of 170 feet. To increase this width to 300 feet would require additional authorization by the Congress. This is in accordance with the normal procedure of Congress in authorizing improvement of waterways to meet existing needs; and of subsequently authorizing increases in scope when the growing demands of commerce make such action necessary. The authority delegated to the Chief of Engineers by Congress to make necessary modifications of authorized projects does not extend to major increases in project scope, such as that which would be involved in widening the Tennessee-Tombigbee Waterway. (Plt.Ex. 34, pp. 3–4).

Project funds were revoked and planning studies discontinued. Matters remained in this status until the passage of the 1957 Public Works Appropriation Act, which mandated a restudy of the TTW with a view of determining the economic justification of the waterway. This task was primarily assigned to the Corps' district engineer at Mobile. The restudy, labeled Design Memorandum No. 1 (GDM 1), was completed June 30, 1960; it was approved April 12, 1962, by the Chief of Engineers and submitted to Congress. The restudy recommended certain changes in the previous design, notably reducing the number of locks from 18 to 10, and reducing the project's length from 260 to 253 miles. GDM 1 affirmed that the waterway was

> planned with channel dimensions to permit two way navigation by tows composed of six 35- by 195-foot barges, plus towboat, having over-all dimensions of about 70 by 735 feet. The above tow size

was adopted as the maximum practicable for general use after a review of the proposed plan and discussion of the waterway's characteristics with tow-boat operators experienced in navigating confined channels. (GDM 1, ¶ 49, p. 20). Lock dimensions authorized for the plan of improvement are 110 by 600 feet clear, with 13 feet over the lower miter sills. These dimensions are comparable with those completed or under construction on the Tennessee and Warrior-Tombigbee River projects. The 70- by 735-foot tow described above can be locked through a 110- by 600-foot chamber in a single operation by a "set-over" lockage, whereby the towboat is set alongside the barges while locking. This practice is not uncommon on the Ohio River and other waterways. (¶ 50).

Authorized dimensions are 9 by 170 feet in the river section and 12 by 170 feet in the canal and divide sections except in the divide cut itself where dimensions are to be 12 by 150 feet. In the canal and divide sections, passing places 240 feet wide, 1,000 long with 500-foot-long transitions at each end would be placed 4 miles apart; upstream and downstream lock approaches would be widened also. The passing places are spaced so as to occur near the end of each hours run for the average tow. During design stages consideration will be given to eliminating the passing places except at lock approaches, and providing a 9 foot by 200 foot channel in the river section, together with 12 foot deep channels in the canal and divide sections which will have a width of 200 feet at a 9 foot depth under minimum pool conditions. Present indications are that such channels can be constructed within the economic limits of the project. (¶ 52, p. 21).

The restudy emphasized there should be provision for future development, for in ¶ 64, it is stated:

> As a result of planning studies conducted prior to the time the project was classified as "deferred-for-restudy," the governing criteria adopted for the project

stipulated that all structures would be planned so as to permit future enlargement of the channel to a depth of 12 feet and minimum bottom width of 300 feet. Of the total estimated cost of the project, about $1,400,000 represents added cost resulting from provision for future enlargement. Should future conditions warrant, the waterway could be enlarged with a minimum disruption of waterway traffic. (p. 25).

As a result of the 1960 restudy, the Corps recommended that the general plan of improvement as therein proposed, GDM 1, be approved, subject to such modifications as the Chief of Engineers may deem advisable, and that the authorized project be restored to an active status. This restudy was reported to Congress with a positive benefit/cost ratio of 1.08 to 1 calculated on the basis of a 2⅝% interest rate.

The 1965 Public Works Appropriation Act, which Congress enacted August 30, 1964, authorized reevaluation of the economics of the TTW. The district engineer at Mobile completed reevaluation of the project's economics on June 30, 1966, in a document designated as Supplement to GDM 1. The scope of the report included a reexamination of the project plan to determine its capability for handling modern barge traffic, particularly with respect to channel widths, and to determine the project width which would yield maximum excess of benefits over costs. Cost estimates were made for both 200' and 300' (width in actual divide cut would be 20' less in both cases considered). No estimate, however, for the 170' project was prepared "since that width would unduly restrict tow size and would not be comparable to the connecting channels in the Tennessee and Black Warrior-Tombigee waterway" (¶ 9, Supp. to GDM 1). Although the 170' channel width provided in GDM 1 was "designed to permit 2-way navigation by a tow composed of six 35- by 195-foot barges (2 abreast, 3 in tandem) plus towboat, the tow having an overall length of 735 feet and width of 70 feet," (¶ 13, p. 4) reevaluation conferences between representatives of the Office, Chief of Engineers, Board of Engineers for Rivers and Harbors, Division Engineers, South Atlantic Division and Mobile District Office, resulted in adoption of minimum channel widths for 2-way navigation as follows:

| Barges per tow (35' × 195') | Width of tow | Bottom Width of Channel [1] |
|---|---|---|
| 3 | 70' | 170' |
| 6 | 70' | 200' |

[1] 20 feet less in divide cut.

The above widths were considered to give satisfactory clearance between maximum size tows as provided above for 2-way traffic.

Although the section ratios in the canal section and divide cut would be somewhat smaller than 4.5 to 1 for maximum size tows loaded to capacity, under actual operating conditions and considering the many and variable sizes of tows and operating drafts under varying loads, channel dimensions adopted for each tow size investigated should be adequate for the prospective traffic. (Supp. to GDM 1, ¶ 14, p. 4).

Preliminary analysis of barge rate factors and comparison of rates, Tennessee-Tombigbee versus the Mississippi River alternative route, indicated that traffic limited to a 3-barge tow via the Tennessee-Tombigbee could not compete with the Mississippi River waterway carrier rate where much larger tows are employed. Accordingly, construction cost estimates were developed for project widths of 200 feet and for 300 feet (20 feet less in the divide cut). Benefits have also been developed for these widths, based on utilization of larger tows. (Id. ¶ 15, p. 4–5).

Navigation benefits were computed on the basis of using 6-barge tows on the 200-foot project and 8-barge tows on the 300-foot project. The 300-foot project would enable waterway carriers to operate 8-barge tows in two-way traffic, and the locks would accommodate an entire 8-barge tow, with towboat, without requiring any alteration of the usual tow formation. (Id. ¶ 21, p. 7).

894

This study concluded that the 300' channel would project a positive cost/benefit ratio of 1.24 as against a ratio of 1.10 for a 200' project. The district engineer concluded his report by stating that

> the most practicable plan of improvement consists of a channel with bottom width of 300 feet (280 feet in the divide cut) and that the project is economically justified when all tangible, intangible, and secondary benefits are taken into consideration. Accordingly, he recommends approval of the plans and estimates presented herein. (Id. ¶ 37, p. 13).

The report contained no recommendations that Congress enact legislation to approve the enlarged dimensions proposed in the 1966 economic reanalysis. In the interval since 1960, 8-barge tows had become common navigation configurations on the Tennessee River, as well as on the Ohio and Mississippi, all of which had minimum authorized channels of 300' width and 9' depth. The BWT, south of Demopolis, however, still remained with no more than a 200' authorized channel width, and limited lock capacity. Both of these factors precluded efficient navigation of 8-barge tows on that waterway. In recognition of this, the reevaluation report included in the cost of the TTW project "adding duplicate locks at the Jackson and Demopolis projects when the combined traffic on the Black Warrior-Tombigbee and Tennessee-Tombigbee exceed the capacities of the single locks at those locations." (Id. ¶ 19, p. 6)

On October 6, 1966, General William F. Cassidy, Chief of Engineers, sent a memorandum to the Special Assistant to the Secretary of the Army for Civil Functions enclosing copy of the 1966 economic reevaluation report. The Chief of Engineers tentatively approved widening the waterway to a 300' channel as the basis for further planning. The Chief of Engineers, making reference to the discretionary authority vested in the Secretary of War (Army), stated that the Secretary's approval "will be necessary prior to proceeding with detailed design of a 300 foot waterway." He concluded as follows:

> [I]n addition to requesting your clearance to issue my tentative findings on the economic reevaluation of the Tennessee-Tombigbee Waterway project, I also request the tentative approval of the Secretary of the Army to enlarge the waterway to 300 feet, with final approval of the enlargement to be contingent on a favorable finding by the Chief of Engineers after consideration of the views and comments of proponents and opponents of the waterway. (Deft.Ex. 33).

On October 26, 1966, Alfred B. Fitt, Special Assistant to the Secretary of the Army for Civil Functions, issued a memorandum that the Secretary of the Army tentatively had given his approval to the 300' width recommended by the reporting officers and requested the Chief of Engineers to issue tentative findings on the economic reevaluation of the project. (Deft.Ex. 34).

On November 3, 1966, the Chief of Engineers issued a public announcement that an economic reevaluation of the waterway project had been made in response to a directive of the House Appropriations Committee in its report on the Public Works Appropriations Act, 1965. The notice advised that the Corps had considered minimum widths of 200' and 300' and concluded that the project was economically justified with either width but was better justified with the 300' width. Interested parties were invited to present their views and comments concerning the report to the Chief of Engineers within 30 days from the date of this announcement to receive consideration prior to the submission of the Chief of Engineers' final views to the Appropriations Committees of the Congress. (Deft.Ex. 36).

This economic reevaluation report was submitted to Secretary of War Stanley Resor by General Cassidy on March 20, 1967, who stated:

> The District Engineer, Mobile District, and the Division Engineer, South Atlantic Division, find that the project is economically justified. The plan for the authorized project provides for a 253-mile canalized waterway joining the Tennessee and

Tombigbee Rivers to serve barge navigation. The project would provide a maximum depth of 9 feet. Five locks and dams and five separate locks are planned to provide a slack-water route over the 341-foot drop in elevation from the Pickwick Pool on the Tennessee River to the Demopolis Pool on the Tombigbee River. Minimum width of 200 feet and 300 feet were given detailed consideration. The 170-foot width contemplated at the time of project authorization was given only minimum consideration as being inadequate for the volume of commerce and the size of barge tows expected to use the waterway. The reporting officers concluded that the project is economically justified with either the 200- or 300-foot width but is better justified with the 300-foot width. The estimated first cost of the project with a 300-foot width is $316 million, of which $239 million would be Federal. The ratio of average annual benefits to average annual cost, over a 50-year economic life, was estimated at 1.24 to 1 by the reporting officers.

After a careful review of the report submitted by the Division and District Engineers, I issued a public announcement on 3 November 1966 tentatively concurring in the findings of the reporting officers and inviting the written views and comments of interested parties concerning the report and its findings. The data submitted in response to the public announcement have been reviewed and evaluated, and I hereby confirm the earlier finding that the 300-foot wide waterway is economically justified with an estimated benefit-to-cost ratio of 1.24 to 1. I further recommend that you exercise your discretionary authority under the 1946 River and Harbor Act to approve an increase in the project width

from 170 feet to 300 feet so that further planning may proceed on the basis of a 300-foot wide waterway. (Plt.Ex. 6).[4]

(e) *Exercise of Discretionary Authority.*

Ten days later, March 30, 1967, Secretary Resor executed the following document:

Under the discretionary authority of the River and Harbor Act of 1946 (Public Law 525, 79th Congress), I approve an increase in the width of the Tennessee-Tombigbee Waterway from 170 feet to 300 feet so that further planning may proceed on the basis of a 300-foot wide waterway. (Plt.Ex. 7).

Simultaneously therewith, the Secretary of the Army furnished a copy of the report to the Chairmen of the House and Senate Public Works Committees and Appropriations Committees. A copy of the Secretary's memorandum of March 30 was also forwarded to the Chairmen of the aforesaid committees. The Bureau of the Budget was likewise advised (Plt.Ex. 4). In the Secretary's letter of transmittal, he pointed out that although the economic reevaluation report recommended a 300' channel width with an estimated benefits-cost ratio of 1.24, the project was only marginally justified. The congressional committees, upon receipt of the report, took no action on the recommendations, and no authorizing legislation was requested of or adopted by the Congress.

On April 4, 1967, the Chairmen of the Public Works Committees of the House and the Senate advised General Cassidy that $500,000 would be allocated from available funds to permit resumption and continuation of the preconstruction planning and design through fiscal 1968. (Deft.Ex. 47 and 48).

4. Although it is apparent that both the 1966 reevaluation report and General Cassidy assumed a positive BCR was based upon navigation benefits of 8-barge tows operating between the Tennessee River and Mobile, this assumption did take into account reduced tow speeds, and hence lesser navigation benefits because of existing constraints of the BWT south of Demopolis to 8-barge tows. The Corps assumed it had existing authority under 33 U.S.C. § 5 to eliminate these constraints because of three factors: (1) the BWT authorized width was for 200' only; (2) the authorized lockage capacity was insufficient for such tows; and (3) sharp bends and turns in the BWT would impede efficient 8-barge navigation. Congress had not been requested to grant authority to eliminate these limiting conditions on the BWT.

## (f) Project Developments After 1967.

Continuing studies by the Corps revealed that restrictive bends in the BWT below the Demopolis lock prohibited the efficient utilization of 8-barge tows as planned for the overall project and that elimination of such bends would require 31 miles of cutoffs. Nevertheless, an EIS for the 300' wide TTW was filed April 20, 1971, and received administrative and congressional as well as judicial approval. *EDF v. Corps of Engineers, supra.* Congress first appropriated construction funds for TTW in the fiscal year 1971 and continued to do so annually thereafter.

In October 1975, the Corps conducted studies of project costs and benefits (Plt.Ex. 13) for the purpose of furnishing an up-to-date economic feasibility review of the waterway. In this document the division engineer acknowledged "as the benefit analysis progressed it became apparent that additional considerations beyond the presently conceived project would affect the viability of the waterway. These additional considerations govern physical improvements that would be required on the Tombigbee River below the juncture of that river and the Warrior River." [5]

The 1975 study dealt with all aspects of increases in costs and revealed that A. T. Kearney, Chicago management consultant, had been selected in February 1975 to update the navigation benefits. Based upon Kearney's report, annual commerce moving over the waterway is projected to increase from 28 million tons for the initial year of the project to 99 million tons by the fiftieth year of the project. The Corps' reanalysis was concerned with project modifications which impacted on the Tombigbee River below Demopolis (BWT). These considerations consisted of three elements: (1) duplicate locks at Demopolis and Coffeeville; (2) channel improvements from Demopolis to Mobile; and (3) relocations between Demopolis and Mobile. The 1975 report concluded:

> As a result of the in-depth review of the presently conceived project, the various alternatives, and with particular attention directed to the drastic cost increases, the problem of proper authorization for the Tennessee-Tombigbee has now become the main concern. At this point it should be noted that in the Senate Appropriation Committee hearings of 1971 a description of the presently conceived project was presented by General Free, Division Engineer. Based on this we consider that disclosure has been made as to the changes incorporated into the present project. Recognizing that the increases in cost have created a difficult situation in respect to authorization and with cognizance of the testimony of the chief of engineers in Senate hearings on appropriations in 1975 concerning the GAO review of escalating cost we feel that attention must be directed to the question of authorization. (Plt.Ex. 13, p. 8).

Corps personnel considered several alternative actions and tentatively decided to continue construction of the TTW project "for which we have firm authority" (300') and "seek authorization for the preferred expanded project" of a 300' wide channel dimension with duplicate locks and cutoffs from Demopolis to Mobile. In September 1975, Corps officials from the Mobile and

---

5. Directly bearing upon the Corps' concern was an adverse ruling handed down September 6, 1974, by the United States District Court of the District of Columbia, in *Atchison, Topeka & Sante Fe RR Co. v. Callaway,* 382 F.Supp. 610 (D.C.D.C.1974), that the Corps was without legal authority under 33 U.S.C. § 5 to construct a new lock and dam which would more than triple the traffic capability on the upper Mississippi River. This action, familiarly known as the Locks and Dam 26 case, held that such a project required specific authorization from Congress under 33 U.S.C. § 401.

Section 5 authorizes the Secretary of the Army, upon recommendation of the Chief of Engineers, to effect reconstruction of waterways essential for existing navigation, while § 401 makes it unlawful for the Corps to make any new structures in any navigable water of the United States until the consent of the Congress has been obtained and the plans have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army.

Nashville Districts, the South Atlantic Division, ORD and OCE met in Atlanta and agreed to analyze several plans for benefits and costs. There ensued a restudy of project costs and benefits which was submitted to the office of Chief of Engineers February 12, 1976 (Plt.Ex. 38), recommending prosecution of the construction of the authorized project for the TTW (Plan A) and the preparation of a feasibility report to investigate the additional navigational works contemplated under Plan C. Plan A consists of the TTW project extending from Demopolis to Pickwick, with main channel dimensions in the river section of 300' width and 9' depth, in the canal section 300' width and 12' depth, and in the divide section 280' width and 12' depth with a series of navigation locks and dams. Plan C contemplated additional navigation work downriver from Demopolis on the BWT, e. g., provision for cutoffs, channel widening, bend easings, bridge modifications and provision for duplicate locks at the Demopolis and Coffeeville Locks and Dams in order that authorization of those modifications may be presented to Congress (Id. ¶ 76, p. 40). This report included a statement that recent studies of the existing navigation channel downstream from Demopolis revealed "that 8-barge tows would be impracticable because of channel widths, curvature or configuration at 44 locations and the clearances at 3 bridges spanning that reach. Since these constraints to traffic would impose limitation on traffic volume, tow sizes and tow speeds [for a length of 217 miles], early in the project life this second reevaluation was identified for study." (Id. ¶ 15, p. 7). This report was the result of General Morris, Chief of Engineers, having directed that the restudy effort be completed by November 17, 1975. The division engineer, Major General LeTellier, directed the Mobile district engineer to include in the restudy an analysis "of the currently authorized project (300' waterway without duplicate locks at Demopolis and Coffeeville and without channel improvements below Demopolis Pool) and the ultimate proposed project (300' waterway with features excluded above)." (Plt.Ex. 23).

On November 25, 1977, the office of the Chief of Engineers, acting by Major General McGinnis, concurred with the recommendations of the division engineer, stating in view of the fact that the 300-foot project is authorized and under construction, the 200-foot alternative can be eliminated as an alternative in the Black Warrior-Tombigbee study. (Plt.Ex. 32).

(g) *Appropriations to the Waterway Project.*

On November 8, 1968, Robert E. Jordan, III, Special Assistant to the Secretary of the Army for Civil Functions, issued a memorandum to the Secretary of the Army recommending the waterway as a new construction start for fiscal 1970. However, the Appropriations Committee made its initial recommendation for new construction start in fiscal 1971 in the amount of $1,000,-000. The justification sheet for the initial appropriation (Deft.Ex. 38) was based upon a length of 253 miles, bottom widths of 300' in the river and canal sections and 280' in the divide section, depths of 9' in the river section and 12' in the canal and divide sections, and for 10 single lift locks. This justification sheet contained a paragraph headed "Major Design Changes Since Project Authorization:"

The project plan for Gainesville Lock and Dam proposed in the authorizing document has been modified to effect a reduction of the number of navigational structures required and to secure better hydraulic and construction conditions. In the authorized plan the river section of the waterway provided for a series of 7 locks to accomplish the required lift from the Demopolis pool to the canal section at Amory. In studies for the plan presented in the general design memorandum covering the entire waterway it was found feasible to eliminate 3 intermediate river section locks and dams by increasing the lift at the remaining 4 locks and widening the navigation channel from 170 to 300 feet. (Deft.Ex. 38).

The requested funds were included in an omnibus appropriation act for fiscal year ending June 30, 1971, to the Corps of Engi-

neers for Civil Works made by Congress. Pub.L.No.91–439, 84 Stat. 890. Each year thereafter justification data showing the length, depths and bottom widths of the waterway were submitted to the Appropriations Committees with requests for additional TTW construction funds for inclusion in omnibus appropriation grants. The Corps allocates funds to TTW out of annual congressional appropriations. The allocations made by the Corps to TTW through fiscal year 1979 total $582,668,000. For the fiscal year 1980, the Corps has requested the sum of $165,000,000 for the TTW. Omnibus appropriations to the Corps, for fiscal year 1971 and each year thereafter, typically are for gross sums appropriated "for the prosecution of river and harbor, flood control, shore protection and related projects authorized by law; and detailed studies and plans and specifications . . . (but such studies shall not constitute a commitment of the Government for construction): $851,256,000 [with sums varying in each year] to remain available until expended. Provided that no part of this appropriation shall be used for projects not authorized by law or which are authorized by law limiting the amount to be appropriated therefor." In none of the appropriation statutes for fiscal years 1971 to 1979 is there mention of authorizing or recognizing TTW's expanded channel dimensions or design changes although several of the Acts, including the 1971 legislation, expressly authorize changes or modifications to specific projects previously authorized or under construction.[6]

(h) *Publicity Attendant Upon Project Modifications.*

Prior to the submission to Congress of the 1966 Supplement to GDM 1 and Secretary Resor's memorandum purporting to exercise discretionary authority to widen the channel, the House of Representatives, while resolved into a Committee of the whole House, was advised by Congressman Whitten that "indications are that [TTW] will likely be between 250 and 300 feet wide," 112 Cong.Rec. 23374 (1966) (Deft.Ex. 43, Attachment 5). On June 24, 1970, Congressman Whitten advised the full House of Representatives that the TTW "will provide a 9 foot slack water navigation channel with bottom widths of 280 feet in the divide cut and 300 feet in the remainder of the route." 116 Cong.Rec. 21252 (1970) (Deft.Ex. 43, Attach. 17). Before requesting discretionary authority from Secretary Resor in 1967, the Chief of Engineers had caused public notice to be given of the modification to a 300 foot wide channel, public hearings were held, and project opponents given a chance to voice their objections. In fact, the American Association of Railroads, as early as May 18, 1967, expressed their position that Congress should reappraise the project authorization because of the recommended increase in width. Hearings on Public Works for Water and Power Resources Development and Atomic Energy Commission Appropriations for Fiscal Year 1969 before a Subcomm. of Senate Comm. on Appropriations, 90th Cong., 2d Sess. 2054, 3235 (1968) (Deft.Ex. 43, Attach. 8). The Corps made full public disclosure of its 1966 economic reanalysis for modifying the channel dimensions of the waterway, and withheld from the Congress or the public no material facts regarding the TTW project. However, prior to the 1974 Locks and Dam 26 decision, the Corps had as-

6. Pub.L.No.92–134, 85 Stat. 365, for $927,926,000 for the fiscal year ending June 30, 1972; Pub.L.No.92–405, 86 Stat. 621, for $1,201.493,000 for the fiscal year ending June 30, 1973; Pub.L.No.93–97, 87 Stat. 318, for $873,589,000 for the fiscal year ending June 30, 1974; Pub.L. No.93–393, 88 Stat. 782, for $973,681,000 for the fiscal year ending June 30, 1975; Pub.L.No. 94–180, 89 Stat. 1035, for $1,228,648,000 for the fiscal year ending June 30, 1976, plus $408,741,000 for the period between July 1, 1976 through September 30, 1976; Pub.L.No.94–355, 90 Stat. 899, for $1,436,745,000 for the fiscal year ending September 30, 1977; Pub.L.No.95–96, 91 Stat. 797, for $1,523,820,000 for the fiscal year ending September 30, 1978; for the fiscal year ending September 30, 1979, H.R. 12928 approved by Congress for $1,342,147,000 was vetoed by the President on October 5, 1978; the House of Representatives sustained the veto on October 5, 1978. The President has, reportedly, included in the 1980 budget the requested allocation of $165,000,000.

sumed it possessed general statutory authority to effect modifications to eliminate existing constraints on the BWT at such time as might be necessary in order to handle the volume of the traffic moving on the completed TTW. As heretofore stated, the Corps, in March 1971, submitted a comprehensive EIS to public authorities as required by NEPA, which disclosed the 300′ channel width in the river and canal sections, and 280′ width in the divide cut, and depths of 9 and 12′. The opponents of the waterway were vocal in public opposition not only before the committees of Congress but elsewhere. During the budgetary hearings for fiscal year 1971 in the House and Senate Subcommittees on Public Works of the Committees on Appropriations, the Association of American Railroads, with representatives from L & N present, spoke in opposition to the funding of the waterway. The Senate Subcommittee also received a communication from CLEAN opposing construction of the waterway. Hearings on Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Bill, 1971, before a Subcomm. of the House Comm. on Appropriations, 91st Cong., 2d Sess. 391, 397 (1971) (Deft.Ex. 43, Attach. 10); Hearings on Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1971 before a Subcomm. of the Senate Comm. on Appropriations, 91st Cong., 2d Sess. 467 (1971) (Deft.Ex. 43, Attach. 11).

(i) *Interpretations of the Congress and the Corps for Post-Authorization Changes.*

Both the Congress and the Corps have traditionally interpreted the discretionary authority to make post-authorization changes of waterway projects without seeking further congressional authority to be subject to certain restrictions. The general view of Congress toward the scope of this grant of executive authority was stated in a 1946 report to the House by the Flood Control Committee:

[I]t has been the policy of the Flood Control Committee and the Congress to recognize that changing conditions often make plans obsolete, and to avoid undue rigidity they have given the Secretary of War and the Chief of Engineers the authority to modify plans as may be found necessary and desirable. The committee finds that this confidence and responsibility has been carefully exercised, and that modifications approved by the Chief of Engineers and the Secretary of War are only those which are clearly within the established policies of the Congress.

H.R.Rep.No.2165, Authorizations for Reservoirs, Levees, and Flood Walls for Flood Control, Flood Control Act of 1946, 79th Cong.2d Sess., May 29, 1946.

The Corps construed the discretionary grant to permit project changes where (a) the scope of the project, i. e., the area to be served, is not materially changed; (b) the purpose or function of the project is not materially altered; or (c) the plan of improvement is not materially changed. In case of material change in any of these respects, the established view of the Chief of Engineers and his subordinates is that congressional approval should be sought, *absent* authorizing legislation that would otherwise increase the usual extent of their discretion.

After the House Appropriations Committee Staff Report and the Corps' response in 1951, see p. 892, *supra*, General Pick testified before a subcommittee of the Appropriations Committee and responded to questions by the committee counsel regarding the Corps' position on its authority with respect to TTW specifically. General Pick replied as follows:

The first point that I would like to cover here is that if the waterway is to be increased to 300 feet, it would require a resurvey and another report to be submitted to the Congress for the authorization. In the building of the Intracoastal Canal, with which I had a lot to do in Louisiana, from New Orleans to the Sabine River, we built that canal 9 feet deep with a 100-foot bottom width. It

had not been completed but a very short time before it was enlarged to 125-foot bottom width and 12 feet deep.

.    .    .    .    .

There has been no thought given to building this waterway to 300 feet. There has been no request from the Congress to survey the waterway and produce a report for the Congress on a 300-foot waterway, nor will the Corps of Engineers take any such steps without a directive from the Congress.

If that waterway is to be enlarged, I would hold immediately that we would require additional legislation.

Hearings before the Subcomm. on Deficiencies and Army Civil Functions of the Comm. on Appropriations, Part 2, 137–38 (1951) (Plt.Ex. 33).

As a result of the Appropriations Committee Staff Report, there ensued an inquiry by the Public Works Committee of the House into the scope of discretionary authority which should properly be accorded the Corps in making construction changes. A special subcommittee was appointed

to study the policies, practices, and procedures in connection with the authorization and construction of river-and-harbor and flood-control projects and report back to the committee with the utmost dispatch its findings and recommendations thereon.

Report on the Civil Functions Program of the Corps of Engineers, United States Army to the House Comm. on Publ. Works from the Subcomm. to Study Civil Works, 82d Cong., 2d Sess. 1 (1952) (Plt.Ex. 35). In its report the subcommittee stated:

Your subcommittee is firmly of the opinion that the administrative officer responsible for water resource project construction must have some latitude in execution because authorizations are not made on the basis of final working plans, and, of course, all contingencies cannot be foreseen. However, there is a question as to the magnitude of a modification which an administrative officer should be authorized to make without specific congressional authority to make a change.

The Chief of Engineers in his testimony agreed that it was desirable for the administrative agency to return to Congress for additional specific authority when major changes were contemplated. As already pointed out the Corps of Engineers says the authorized plan may not be modified without additional authorization by Congress.

.    .    .    .    .

It would appear that the intent of Congress is that the Chief of Engineers may make minor modifications but clearly may not make major changes in a project without congressional action based upon a formal report.

Id. at 22.

The 1951 Chief of Engineers' report made a comprehensive review of the scope of executive authority to modify projects previously approved by Congress, setting forth general principles as follows:

The Corps of Engineers recognizes that this latitude for changes and modifications of authorized projects represents an important delegation of authority, and the Corps has attempted to exercise that authority carefully. In general, the Corps of Engineers considers that there are two types of modifications:

a. Modifications and changes of a project which are necessary for engineering or construction reasons to produce the degree and extent of flood protection or the extent of navigation improvement intended by Congress are within the latitude delegated to the Corps of Engineers. Examples of such changes are shift of a dam to a nearby better location; provision of a greater storage capacity required by more complete flood records; shifts in alinement of channels indicated by more detailed surveys; or changes from a concrete to an earth structure because of lack of proper concrete aggregate. These may be considered generally as engineering modifications.

b. Moderate extensions of project scope such as those required to provide

flood protection to adjacent urban areas which have developed since the project was authorized, or to provide better channel alinement or larger navigation locks to meet the needs of developing commerce. It would obviously be uneconomical and contrary to the intent of Congress to construct obsolete projects, or to omit flood protection for a part of a city when it was the intent of Congress to authorize flood protection for that city. These may be considered generally as project modifications necessary to meet changed physical and economic conditions.

.    .    .    .    .

On the other hand, the Corps of Engineers has considered that it does not have latitude to make modifications which materially extend the scope and change the functions of the project authorized by Congress. It considers that it is necessary to bring a proposed modification of an authorized project to the attention of Congress if further study after authorization shows that:

a. *The scope or functions of the project will be materially changed thereby.*

b. *The plan of improvement will be materially changed from that originally authorized by Congress.*

c. *There are special circumstances which were not known to the Corps of Engineers or recognized by Congress when the project was authorized.*

No hard-and-fast rule can be cited as governing when a project modification should be presented to Congress for further consideration. Increased cost over the estimate presented to Congress as a basis for authorization is not necessarily a governing criterion, as the major factors giving rise to increased costs are separate and apart from the intent of Congress in authorizing an improvement, and as the Appropriations Committee of Congress are advised of cost changes year by year. (Our emphasis).

These general principles appear to have furnished continuing guidance to the Corps since their publication in 1951. As recently as 1972, the General Counsel for the Corps, when asked his opinion on authority to make a proposed modification of an unrelated project, quoted from a 1969 legal memorandum to the Special Assistant to the Secretary of the Army containing substantially the same language as that in the 1951 Chief's Report (Plt.Ex. 39), and concluded:

The above statement is considered to be an accurate general definition of the discretionary authority of the Chief of Engineers. It is a definition which has been accepted by the Congress and followed by the Corps. It is, however, a very general statement, and some clarification is helpful.

It is the view of this office that the discretionary authority given the Chief of Engineers to make post-authorization changes in projects extends only to what might be termed engineering changes: that is, changes which involve the location, dimension, method of construction, minor variations in the allocation of storage for the various project purposes, and changes in the size and scope of the project to meet needs which differ from those which existed at the time of authorization, so long as the scope and function of the project are not materially altered. The above changes may be made for engineering reasons (i. e., differing foundation conditions) or for economic reasons (i. e., expansion of the town to be protected or larger vessels being used in waterborne commerce). The discretionary authority is not considered to include matters which materially alter the nature of the project, such as the deletion or addition of project purposes where not otherwise authorized by law, or substantial changes in the relative sizes of project purposes. Likewise, the discretionary authority does not contemplate changes in the elements of a project which embody legal relationships, such as requirements of local cooperation which are, in effect, conditions imposed by the Congress to construction of the project. Given the

above guidelines, each proposed post-authorization change must be examined individually, and whether the change is or is not a permissible one is finally, a matter of judgment.

Two additional Corps documents have been presented to the court on the assertion that they establish binding guidelines upon the Corps with regard to questions of authority for project modifications. The first is a valid regulation promulgated in 1968, ER 1165–2–305 (Def.Ex. 5), which deals not with the necessity of further congressional authority but with information on significant post-authorization project changes required to be submitted to the Bureau of the Budget for budgetary purposes. This regulation therefore sheds little light on the question before the court. The other document is a draft regulation, ER 1105–2–31, recently prepared by the Planning Division of the Corps to eventually supersede ER 1165–2–305 (Plt.Ex. 41). This draft directly addresses the question of the Corps' authority to make post-authorization changes and is the Corps' first attempt to establish quantifying guidelines on when further congressional authorization is required. (Plt.Ex. 41, App. B). The draft has not yet been adopted by the Corps, however, and indeed has yet to be reviewed by Corps Counsel, the Director of Civil Works or the Chief of Engineers.

At the trial, the views of three Corps officials were presented on the extent of the Chief's traditional discretionary authority to make project modifications. Lt. Gen. John W. Morris, Chief of Engineers, testified that in his opinion the TTW, as currently being constructed, is the project contemplated by Congress in 1946. It was his opinion that Congress "would [not] expect us to take the taxpayers' money in 1979 and build a Model-T." (Trial Trans. 865). Unless major changes had been effected in the function or purpose of the project, Congress "expected the Corps . . . to execute its programs at the time they are being executed to modern requirements," (Trial Trans. 866) not the requirements which existed at the time of authorization.

General Morris did not believe that additional congressional authorization was required for the challenged project modifications of TTW. He found his position consistent with the 1951 Corps' statements, see pp. 892 and 900–902, *supra*, interpreting that language to mean that once the TTW construction was completed, further congressional authorization would be required to modify the completed project.[7] In his words, "once a project is complete, the construction monies have been expended, and so you need new authorization." Until that time, according to Morris, the Secretary of the Army retains the discretionary authority to increase project width to support the projected commerce. (Trial Trans. 869–872).

General Ernest Graves, Deputy Chief of Engineers, was of the view that if dimensions contained in the authorizing document were "found to be inconsistent with a sound design, that would be clearly the very sort of change which the words 'discretion of the Chief of Engineers' were intended to cover— [where] the design progresses after project authorization [and] it becomes clear that some aspect is not consistent with the rest of the design . . . an overall adjustment has to be made. And it is in that process frequently that dimensions get to be changed." (Graves' Dep., Trial Trans. 1581–82). Graves pointed out that the congressionally authorized lock size of 110 × 600 feet could accommodate navigation for three barges wide (105' width) and for two-way navigation of tows that size there might be channel sections too narrow for passage (Id. 1582). Graves was of the opinion that if a "change in dimension does not have the implication of changing the scope of the project but merely is a matter of the necessary engineering design to carry out the intended purpose," congressional authorization need not be procured (Id. Trial

---

7. General Morris supported this interpretation by reference to the Corps' example of the Gulf Intracoastal Waterway, a completed project, which was subsequently widened by legislative action.

Trans. 1933). However, Graves believed if the dimension change was not essential to conform to engineering consistency in design, congressional authorization to widen or deepen the channel should be sought (Id. Trial Trans. 1933–34).

The Chief of the Planning Division, Alex Shwaiko, itemized those changes to a project which have traditionally been recognized as within the Chief's authority. Initial authorization of· a project, he said, means that Congress has directed that a service be performed; "their recognition of the problem exists, a solution exists, and they want that problem taken care of . . we [then] progress into more detailed studies, that can determine . . . how best to provide the most useful and the most efficient project that can deliver that service." (Trial Trans. 1174). According to Shwaiko, changes relating to engineering, construction, economic efficiencies and physical conditions in the area warrant modifications by the Chief as may further geologic or hydrologic studies. While Shwaiko acknowledged that the authorizing legislation of a project determines the scope and function of the project, he expressed no opinion as to the extent of authority granted the Chief of Engineers and the Secretary of the Army by House Doc. 486.

(j) *Other Design Changes Since 1946.*

Apart from the change in width from 170 to 300' in the river and canal sections and 150 to 280' in the divide section, plaintiffs challenge certain other design changes on the TTW as being beyond the authority of the Corps.

House Doc. 486 provided that the river section was "with the exception of the cutoffs [to] follow generally the existing channel of the Tombigbee River. Only one major cutoff would be involved." (Id. ¶ 104, p. 39). The project depth for the river section was 9' with· 1' overdraft with the exception of Rattlesnake Bend cutoff, the longest of 21 cutoffs in the river section, where a depth of 12' with 1' overdraft was specifically provided (¶ 109–110, p. 41).

Under current construction plans, 70% of the river section of the waterway, according to Wayne Odom, Jr., Chief of the Coastal Engineering and Hydraulic Design Section, Mobile District, will have a controlling depth of 9'; depths of 12' are planned throughout the Columbus and Aberdeen Pools and in all cutoffs. Numerous cutoffs added to the design as a result of new bend widening criteria adopted by the Corps in 1973 effectively eliminate 21 miles from the length of the waterway. The Corps decided that the cutoffs were justified economically since excavation required under the new bend widening criteria· would exceed that required by mere addition of cutoffs. Additionally, engineering reasons such as better information on foundation conditions, better topographical surveys and minimum desirable radii of bends justified their decision. The 12' depths in the Aberdeen and Columbus Pools were justified by the 4.5 recommended cross-sectional ratio as an engineering change to aid in the maneuverability of barge navigation within those particular pools.

Another change from the 1946 plan was that from a perched canal above ground level in the canal section to a chain-of-lakes concept in the current design. The perched canal was to "be constructed partly by excavation and partly by levees. There would be 10 locks in the canal section . . . .." Under the chain-of-lakes design concept there are minor variations in the canal section alignment on the eastern edge of the flood plain with the major difference being the elimination of the eastern levees. The tributaries from the east will flow directly into the canal or its reservoirs without any obstruction and then be conveyed to a spillway gate to pass into the Tombigbee River flood plain to the west. Inundated area under the chain-of-lakes concept resulting from reservoirs above each of the locks in that area will encompass 8300 acres rather than 4300 acres contemplated by the 1946 plan. However, this increased inundation did not necessitate the acquisition of additional real estate since much of the acreage now to be inundated was lowland subject to periodic flooding. The chain-of-lakes con-

cept is said to be engineeringly sound for a variety of reasons, such as providing a greater volume of water to stabilize pool levels during heavy lock operations, reducing wave action from the movement of tows, and reducing maintenance of navigational structures, including the now eliminated eastern levee. The Corps determined that the changes, apart from improvement in environmental concerns, was a more productive use of land which would have had to be acquired for the project in any event.

Plaintiffs vigorously challenge the placement of five dams in the canal section since the 1946 design did not call for dams in that area. At each of the five locks, instead of a levee on the eastern side to confine the water in the lock area, the present plans call for a dam to tie the lock into higher ground and allow the water to flow back up against the valley wall. According to Odom, "it [is] the same thing, you have just eliminated a considerable length of dam." (Trial Tr. p. 1334). Plaintiffs also challenge the increased depth of miter sills on the locks throughout, since the 1946 plan provided only for 13' depth on all miter sills, and the Corps has since provided for at least 15' depth on all miter sills on all locks and up to 18' on selected locks. According to Odom, these increased depths are necessary to allow ease of entry by vessels into the lock chamber and greater maneuverability.

Another change in the design is the construction of several dikes or causeways, one at the Yellow Creek embayment, one across the Tibbee River, and one across the Tombigbee River north of the Columbus Lock and Dam. As for the latter two structures, the evidence shows that although they are presently blocking the two rivers, when the project is completed they will be at least 13' below pool level and will not be an obstruction to navigation, their purpose being to control cross-currents for vessels entering the lock. In the Yellow Creek embayment, the elimination of a small inlet in the Pickwick Pool will be filled with excavated material to create a land mass. The structure will form a TVA port facility and does not otherwise obstruct navigation either in Yellow Creek or the Pickwick Pool reservoir.

## II.

Our jurisdiction to determine the present controversy under 28 U.S.C. § 1331 is acknowledged by the parties. We must first deal with the defenses of res judicata, collateral estoppel and laches raised by defendants as a result of the prior litigation which upheld the Corps' compliance with NEPA in planning the waterway. Under the doctrine of res judicata, "a judgment in a prior suit between the same parties bars a suit on the same cause of action not only as to all matters offered at the first proceeding, but also as to all issues that could have been litigated. Collateral estoppel, however, precludes relitigation only of those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action." *Johnson v. United States,* 576 F.2d 606, 611 (5 Cir. 1978); *Stevenson v. International Paper Co.,* 516 F.2d 103 (5 Cir. 1975). Res judicata may not here apply since the present suit not only involves several parties plaintiff (L & N, National Audubon Society, Birmingham Audubon Society and the Alabama Conservancy) which were not in the former litigation, but also because the authorization issue was not within the scope of the complaint or other pleadings in the earlier case making the issue a different cause of action from those involved in the first case. The Fifth Circuit has recognized that "the principle test for comparing causes of action is whether or not the primary right and duty and delict or wrong are the same in each action." *Stevenson, supra,* at 109, citing *Seaboard Coast Line RR v. Gulf Oil Corp.,* 409 F.2d 879, 881 (5 Cir. 1969). See also *Carr v. United States,* 507 F.2d 191, 193–94 (5 Cir.), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975). Clearly a challenge based upon noncompliance with environmental laws presents a different cause of action than the issue of the Corps' lack of authority to construct a channel with dimensions in excess of statutory authorization. Collateral estoppel does not apply because the issue of Corps authority was not actually litigated in the prior case.

The stipulated facts in the prior litigation regarding the channel dimensions are not of sufficient force to estop the plaintiffs from bringing the present action, for collateral estoppel "is limited to [those] matters distinctly put in issue, litigated, and determined in the former action." *Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.,* 430 F.2d 38, 45 (5 Cir. 1970). See *Johnson, supra,* at 615. "An issue resolved by stipulation is neither litigated nor determined by the court in the sense that the doctrine of collateral estoppel normally requires." 1B Moore's Fed.Practice ¶ 0.444[4], at 4029.

The equitable doctrine of laches, which defendants strenuously urge, is quite another matter, at least as it bears upon the discrete issue of whether the Secretary of the Army, by his memorandum of March 30, 1967, exceeded the limits of his discretionary authority in approving an increase in the width of the TTW from 170 to 300'. The challenge made to this executive action is, of course, quite different from, and independent of, the contentions of the plaintiffs that the Corps in respects other than widening the channel has made major changes in design, in excess of lawful authority, in recent years during the period of actual construction of the TTW.

■ It is settled law that the doctrine of laches applies in the context of public-issue litigation. *See Save Our Wetlands v. United States Army Corps of Engineers,* 549 F.2d 1021, 1026 (5 Cir.) *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Ecology Center of Louisiana v. Coleman,* 515 F.2d 860, 867 (5 Cir. 1975), *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.), *aff'd.* 461 F.2d 1266 (5 Cir. 1972). Courts have frequently said that the existence of laches is primarily a question of fact addressed to the discretion of the trial court upon the circumstances of the particular case. It is a doctrine based on public policy requiring discouragement of stale demands. Laches is not based upon the mere lapse of time, but is principally a question of inequity of permitting a claim to be enforced where some change in condition has taken place

which would make enforcement of the claim unjust. *Davis v. Alabama Power Co.,* 383 F.Supp. 880 (N.D.Ala.1974), *aff'd.* 542 F.2d 650 (1976) (per curiam), *aff'd.* 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977). We are further instructed by the Supreme Court:

> Though the existence of laches is a question primarily addressed to the discretion of the trial court, the matter should not be determined merely by a reference to and a mechanical application of the statute of limitations. The equities of the parties must be considered as well. Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief.

*Gardner v. Panama R. R.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed. 31, 36 (1951).

■ In the case sub judice, we find as a fact that since the present suit was not filed until November 30, 1976, a delay of more than nine years occurred before any challenge was made to the Secretary of the Army's authority to widen the channel dimensions of the TTW. Any claim based upon the unauthorized action of the Secretary of the Army would have accrued upon the issuance of his memorandum of March 30, 1967. Courts, in considering the applicability of laches, are not to make a judgment based upon a mechanical application of the statute of limitations. However, it is to be noted that a lapse of nine years is a period of time well beyond the six-year statute of limitations provided for bringing civil actions against the United States, 28 U.S.C. § 2401(a), which is the same period prescribed by the law of the forum state, Miss. Code Ann. § 15–1–49 (1972). More than five and one-half years elapsed from the time the President of the United States presided over the dedication and groundbreaking ceremony of the TTW at Mobile, Alabama, before the filing of the present action.

Moreover, it is abundantly clear from the evidence that this considerable delay on the part of the plaintiffs was not excusable

since they knew or had ample means of knowing that there existed a question of the executive authority to widen the channel. This issue was certainly known from the time that the Corps conducted public hearings on the recommendation to widen the TTW to 300′, pursuant to public notice given to all interested parties as to the impending decision of the Secretary of the Army to exercise his discretionary authority. Equally well known was that such action was based upon the Chief of Engineers, General Cassidy, concluding that the 170′ originally specified was inadequate for the "volume of commerce and the size of barge tows expected to use the waterway." *Supra* p. 895. At these hearings, opponents of the project availed themselves of the opportunity to object to widening the channel from 170 to 300′. The decision of Secretary Resor to exercise his authority, when made, was promptly submitted to the Chairmen of the House and Senate Public Works Committees and was also conveyed to the Bureau of the Budget. In fact, as soon as May 18, 1967, the American Association of Railroads expressed their position that Congress should reappraise the project authorization because of the recommended increase in width. The plaintiffs, L & N and CLEAN, continued to voice their objections to the new design before congressional committees, making known their adverse positions as early as 1971. As heretofore found, there was full public disclosure by the Corps of its 1966 economic reanalysis modifying the channel dimensions of the waterway; no material facts regarding the TTW project were withheld from the public. When new construction start funds were initially provided in 1971, the Corps submitted a justification sheet disclosing the modified channel dimensions of the TTW. In March 1971, the Corps submitted a comprehensive EIS to public authorities which disclosed the 300′ channel width in the river and canal sections, 280′ width in the divide

cut and depths of 9 and 12′. This EIS was widely distributed to interested parties and was well known to EDF, CLEAN and other environmental groups interested in the TTW project. A cursory reading of the EIS would have disclosed the increased channel dimensions. Anyone interested, including the plaintiffs, could have easily obtained such information if they had not been previously apprised of the changes. Moreover, EDF, CLEAN and a plaintiff class of aggrieved individuals in their 1971 suit attacking the waterway project on various environmental grounds, neglected to include in their action any question about the known exercise of authority by the Secretary of the Army to increase the waterway dimensions. The pendency of that action, brought by some of the same counsel who appear for the plaintiffs in the present suit, was widely publicized throughout the nation, and its existence was or should have been known to all parties who are plaintiffs in the present action. Additionally, the construction start of the waterway project commencing with the Gainesville Lock and Dam and followed by other prominent segments of the work received wide publicity long before the institution of the present action. A delay of more than nine years, in our opinion, before seeking a remedy against allegedly unauthorized widening of the channel, is clearly inexcusable. Indeed, plaintiffs present no credible reason or explanation for the long delay.

The third essential prerequisite for the application of laches is whether undue prejudice has been suffered by the defendants by reason of the belated assertion of the claim. The undisputed evidence shows that the Corps has allocated nearly $600,000,000 to the construction of the project, the greater part of which has been expended to date, and various segments of the waterway are and have been for more than five years under construction.[8] The evidence shows

---

8. According to the latest available data, percentages of completion of the various portions of the project are as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Demopolis Lake | 70% | Lock B | 9% | Aberdeen Lock & Dam | 29% | Bay Springs Lock |
| Gainesville Lock & Dam | 75% | Lock C | 2% | Lock A | 25% | & Dam 7% |
| Aliceville Lock & Dam | 55% | Lock D | 2% | | | Divide Cut 28% |
| Columbus Lock & Dam | 38% | Lock E | 1% | | | Entire Project (Deft. Ex. 39) 29% |

that the function of waterway structures, whose design has been based upon a 300′ wide channel, would be compromised, and a number of structures already built would have to be reconstructed in the event the channel width was reduced to 170′. The evidence also shows that several highway bridges, representing public works largely financed by the States of Mississippi and Alabama, are under construction; these bridges are so designed to accommodate flood stages for a 300′ wide waterway and would be too low for clearance during flood stage if the channel were reduced to 170′. In opposition to these considerations is the fact that, according to present cost estimates, more than $1 billion of public funds must yet be expended to complete the project. Whether these expenditures will, in fact, occur depends altogether upon future appropriations that Congress, in its wisdom and within its sole prerogative, may see fit to grant for the continuance of the project.

In this situation we are required, by the teachings of *Save Our Wetlands,* to balance the equities, considering both the expenditures which have been made and those which are required to be made if the project is to be completed, the relative positions in which the parties are found, as well as benefits that may inhere in, or be opposed to, plaintiffs' assertion of their claim that the channel dimensions are legally unauthorized. In *Save Our Wetlands,* undue prejudice was found to exist on a showing that the Eden Isles project, upon which $26 million had been expended, was substantially completed. The Fifth Circuit in this situation held laches to be an appropriate defense. The defense of laches was rejected in *Ecology Center of La., supra,* upon a finding that no more than $1 million had been spent on the construction of an interstate highway estimated to cost $667 million. Similarly, in *Inman Park Restoration v. Urban Mass Transp. Admin.,* 414 F.Supp. 99, 111 (N.D.Ga.1976), *aff'd.* 576 F.2d 573 (5 Cir. 1978), the District Court rejected laches upon the authority of *Ecology Center of La.,* saying "[a]lthough a great amount of money, time and effort has already been expended, when compared to the total amount to be spent on the MARTA project it represents only a small percentage." In this case, which was cited with approval in *Save Our Wetlands,* 549 F.2d at 1028, n. 11, it appeared that no actual physical construction had been commenced on the segments of the project under dispute. Courts have often considered laches as a valid defense where "construction may have gone so far that for economic reasons it would be impractical or impossible to alter much of the basic plan." *Organizations United for Ecology v. Bell,* 446 F.Supp. 535, 551 (M.D. Pa.1978), and cases cited therein.

Our case, factually, fits neither the *Save Our Wetlands* decision which upheld the defense of laches, nor *Ecology Center of La.,* where the opposite result was reached. We are thus constrained to exercise that degree of discretion which must be controlled by consideration of equity and sound public policy. The issue is not without complexity because of the competing considerations presented by the evidence. With nearly one-third of the entire project completed, including certain portions of the project having been substantially finished, we are constrained to find that undue prejudice has been suffered by the defendants in the accomplishment of their statutorily charged duties. An added factor in the equation of whether prejudice is "undue" must be a consideration of the navigation and economic benefits derived from having the project completed without interruption, and at an early date, balanced against the claim that the Corps' officials have exceeded lawful power granted to them in the exercise of their discretionary authority to widen the waterway channel. Given the unique circumstances of this case, we find present all essential elements of the defense of laches, i. e., a long and inexcusable delay in asserting plaintiffs' claim and undue prejudice of such substantial magnitude as to bar plaintiffs from now seeking to litigate their claim that the channel dimensions were increased from 170 to 300′ without lawful authorization.

Candor requires us to add, however, that if laches were not an effective defense, and the question of width authorization remained open for determination upon the merits, plaintiffs' challenge would deserve careful scrutiny. For, while the evidence persuades us that the terms of the authorizing statute, the scope of the discretionary authority traditionally exercised by the Chief of Engineers, and the disclosures made to Congress in 1962 by GDM 1, would clearly justify widening the channel from 170 to 200' to allow for safe passage of 2-way tows 70' in width, it is no less clear that widening the channel to 300' was, in 1962, scheduled only for future development. Since the 1966 economic reanalysis recommending a channel increase to 300' to accommodate 8-barge tows 105' in width was never expressly approved by Congress, the question posed is whether the decision of the Secretary of the Army, based upon studies made by the Chief of Engineers and his subordinates, to accelerate the implementation of the ultimately planned channel width to 300' was in excess of discretionary authority. Resolution of this question, one of first impression, would, of course, depend entirely upon application of the statutory language in conjunction with the long-standing guidelines imposed by the Corps upon itself with regard to discretionary authority to modify authorized projects. See pp. 908–909 *infra.*

### III.

Plaintiffs also mount an attack upon various features of design changes in the waterway, wholly apart from the 300' widening of the channel. These are challenges to the authorization for the chain-of-lakes concept in lieu of the perched canal, massive river bend cutoffs and channel alterations, canalizing and deepening of the river section, placement of dams in the canal section and providing greater depth for miter sills on all locks—design changes which admittedly have come about since the termination of the prior suit and many of which were adopted shortly before the filing of the present suit.

We agree with plaintiffs' general assertions that "the determination of the necessity for a given improvement of navig[ational] capacity, and the character and extent of it, is for [the] Congress alone," *United States v. Chicago M., St. P. & P. R. R.,* 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064, 1069 (1941), and that neither the Secretary of the Army nor the Chief of Engineers has unlimited authority to make such modifications to waterway projects as they may choose, for such power would raise "the specter of an unlawful delegation of legislative power." *Atchison T. & S. F. Ry. v. Callaway,* 382 F.Supp. 610, 616 (D.C.D.C. 1974).

Although courts have held that plans contained in House and Senate documents authorizing a particular water project are subject to such modifications as the Secretary of the Army or the Chief of Engineers find necessary from further studies, *United States v. 2606.84 Acres of Land in Tarrant County, Texas,* 432 F.2d 1286, 1292 (5 Cir. 1970); *Thetford v. United States,* 404 F.2d 301 (10 Cir. 1968), no court has, from our research, undertaken to define the precise limits of the Corps officials' authority to make "such modifications as in the discretion of the Secretary of War [Army] may be advisable." [9]

The weight of the evidence shows that, despite contrary opinions held by some lower echelon Corps officials, the Chief of Engineers has consistently held that his au-

---

**9.** The evidence showed that the discretionary authority conferred upon the Secretary of War in the earlier Acts was in later years conferred upon the Chief of Engineers. In any event, it is virtually conceded by defendants that the conferring of discretionary authority upon the Secretary of War (Army) carried no greater or different grant of authority than had it been conferred upon the Chief of Engineers alone.

thority to make changes to waterway projects without seeking congressional approval is subject to definite limitations. In summary, it was deemed necessary to bring a project change to the attention of Congress and secure its approval for the modification, if further study after the initial authorization revealed that (1) the scope of the project, i. e., the territorial area to be served, would be materially changed; (2) the purpose or function of the project, i. e., navigation, flood control, etc., would be materially changed; (3) the plan of improvement as originally authorized by Congress would be materially changed; or (4) there existed such circumstances not known to the Chief of Engineers or recognized by Congress when the project was first authorized. 1951 Chief of Engineers' report, see pp. 900–901, *supra*. That these limitations have continued to be the prevailing view within the Corps is evidenced by their application by Corps' counsel as late as 1972 and further by the proposed draft regulation ER 1105–2–31, which, though recently prepared and not yet officially adopted, is nevertheless used for guidance by many districts. The Supreme Court has held that a "consistent and longstanding interpretation by the agency charged with administration of [a statute], while not controlling, is entitled to considerable weight." *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486, 504 (1975); *Saxbe v. Bustos*, 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974).

■ The Chief of Engineers has recognized that there are two types of modifications which are within his authority and may be exercised without obtaining congressional approval. First, modifications and changes necessary for engineering or construction reasons to produce the degree or extent of navigation improvement intended by Congress, such as the shifting of a dam to a nearby better location, shifts in alignment of channels indicated by more detailed surveys, elimination of design inconsistencies, and similar engineering improvements. Second, moderate extensions of project scope to account for develop-

ments occurring after the project was authorized, such as providing better channel alignment, including areas of new commercial or population growth not existing at the time of authorization, and generally taking steps to avoid the construction of obsolete projects. Changes of this nature ordinarily are regarded as project modifications necessary to meet changed physical and economic conditions. We hold that Pub.L.No.79–525, 79th Cong., authorizing the construction of the TTW contained no extraordinary or unusual language which would vary the authority of the Corps officials to make changes in design over and beyond the foregoing limitations without seeking additional authorization from Congress. This brings us to a consideration of whether the challenges to the recent changes in design, either singly or collectively, fall outside the scope of discretionary authority possessed by the Corps officials in accordance with the above stated principles.

(a) *Chain-of-Lakes Concept.*

■ The major change to the canal section has been a conversion from the perched canal concept to a chain-of-lakes design. The reduction of the number of locks from 10 to 5 in the canal necessitated a larger pool above those locks since the lift provided by each lock was increased as a result. This increase in pool sizes would be accomplished more efficiently with an engineering design eliminating the eastern landside levee and providing instead for dams to tie locks into higher ground, thus utilizing the lay of the land as a boundary of the reservoirs. This was, we think, a sound engineering design which would stabilize the pool levels and reduce maintenance in the canal section. As we have found, the chain-of-lakes concept is engineeringly sound for a variety of reasons, not the least of which is to provide a greater volume of water for pool levels during heavy lock operations and promote more efficient navigation through the locks. That the chain-of-lakes design inundates 8300 acres of land, rather than 4300 as previously contemplated, is not a significant change inasmuch as it does not

necessitate the acquisition of additional real estate and because the acreage to be inundated by the pools is lowland subject to periodic flooding under the original design. We think the chain-of-lakes concept is a design well within the scope of discretionary authority of the Chief of Engineers since it is merely the incorporation into the plan of a more modern engineering concept. It does not affect either the scope or purpose of the project, nor does it materially change the plan of improvement.

(b) *Cutoffs and Channel Alterations.*

We find from the evidence that the numerous cutoffs added to the design were necessitated by new bend-widening criteria adopted by the Corps and effectively shortened the length of the waterway. These cutoffs were certainly justified from an engineering standpoint since the amount of excavation otherwise required under the new bend-widening criteria would have been much greater. This change in design, of course, did not affect the scope, purpose or plan of improvement in any material way.

(c) *Canalizing and Deepening the River Section.*

As for the plaintiffs' challenges to the increase in the depth of the Columbus and Aberdeen Pools from 9 to 12' throughout, the evidence shows that the Corps based its decision to deepen these and other portions of the channel upon the 1938 Survey Report which formed the basis for the construction plans for the waterway. This report recommended a channel depth of 12' for the canal section, divide section and cutoffs. In conjunction with this proposal, the report found it "advisable to maintain a channel section at least 4.5 times the standard tow section." (App. II to the 1938 Survey Report, House Doc. 269, pp. 256–57). In planning the Columbus and Aberdeen Pools, the Corps found it sounder engineering to provide cutoffs rather than follow exactly the original existing river bed, thus eliminating the chief bends in the river channel. Since the numerous cutoffs were found to be engineeringly feasible and advisable, the recommendation in the survey report for a depth of 12' was carried throughout, even in those portions of the Columbus and Aberdeen Pools where the waterway route crossed the existing river bed. The deepening of the river channel to 12' was also recommended in the 1938 report wherever practicable in order to reduce power requirements of tows navigating upon the waterway (Id. p. 258). These changes were, without question, justified as improved engineering design and did not change the material plan of improvement. Neither the scope nor purpose of the project was at all altered.

(d) *Greater Depth for Miter Sills.*

Even though the miter sill depth was specified as 13' in House Doc. 486, the Corps has since increased those depths to a minimum of 15' throughout and a maximum of 18' at some locks. The undisputed evidence is that this was done strictly for ease of entry by a tow into a lock and greater maneuverability while locking through. Clearly an engineering change in design of this character would fall within the discretionary authority of the Corps officials.

IV.

Plaintiffs next assert that the defendants have committed several violations of 33 U.S.C. § 401,[10] by constructing several dikes, causeways and dams in the waterway project without obtaining the consent of Congress and having the plans therefor approved by the Chief of Engineers and the Secretary of the Army. The erection of two dikes, one across the Tibbee River and one across the Tombigbee River north of the Columbus Lock and Dam, as well as the

10. It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army.

installation of the structure at Yellow Creek embayment, are contended to be violative of this statute, along with the replacement in the canal section of five locks with five locks and dams.

Admittedly, § 401 was enacted by the Congress "to govern conduct of its own officers and employees as well as that of others." *United States v. Arizona*, 295 U.S. 174, 184, 55 S.Ct. 666, 669, 79 L.Ed. 1371, 1378 (1935). Accordingly, the defendants' actions must be judged by the mandate of that statute.

As previously found, the dikes or causeways across the Tibbee and Tombigbee River are structures which presently obstruct navigation, and if they were to remain in that condition, statutory violations would be the result. The undisputed evidence, however, is that both of these causeways will directly become an integral part of the entire Columbus Lock and Dam system and will, in fact, upon the filling of the Columbus Pool be covered by 13′ of water, and be thus restored to at least their normal navigability. In addition, these particular structures will serve to control cross-currents within the Columbus Pool so as to aid maneuverability of tows in this section of the waterway. An analogous case is *Northern Transp. Co. of Ohio v. Chicago*, 99 U.S. 635, 25 L.Ed. 336 (1879), in which the city of Chicago undertook to construct a tunnel under the Chicago River. During the prosecution of the work, the city erected a coffer-dam in the river, depriving the plaintiffs of access to their property. By the undisputed proof, the erection of such a structure was necessary, if not indispensable, for the construction of the authorized tunnel. Rejecting plaintiffs' claims for damages, the Court said:

[T]he grant of power by the Legislature [to the City] to build a bridge or construct a tunnel carried with it, of course, all that was necessary for the exercise of the power.

. . . . .

In this case the coffer-dam was only a temporary obstruction. It was no physical encroachment upon the plaintiffs' property, and it was maintained only so long as it was needed for the public improvement. The tunnel could not have been constructed without it. We cannot doubt that it was lawfully placed where it was, and having thus been, that the city is not responsible in damages for having erected and maintained it while discharging the duty imposed by the Legislature, the obstruction not having been permanent or unreasonably prolonged.

25 L.Ed. at 338–39.

Cf. *Pigeon River Improv. Slide & B. Co. v. Cox*, 291 U.S. 138, 54 S.Ct. 361, 78 L.Ed. 695 (1934).

█ It logically follows that the construction of these causeways, done in the most economic fashion as essential components of the entire Columbus Lock and Dam structure, being no more than temporary obstructions to navigation and with the ultimate purpose of improving navigation, fall outside the purview of § 401.

As for the structure in the Yellow Creek embayment area, the evidence shows that it is to be a port facility for TVA and does not otherwise obstruct navigation in the Pickwick Pool or Yellow Creek. It should be noted that plaintiffs have alleged violation only of § 401 and not § 403 [11] of the same title, which prohibits "any obstruction not

---

11. The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." Even if a violation of § 403 had been alleged, the evidence fails to show that the navigable capacity of either the Pickwick Pool or Yellow Creek was substantially affected by the land mass created in the embayment. The distinction between §§ 401 and 403 is clearly articulated in *Sierra Club v. Morton,* 400 F.Supp. 610, 629–30 (N.D.Cal.1975), which held:

> Congress must have been aware of the difference between obstructions to navigation [§ 401] and obstructions to navigable capacity [§ 403]. . . . Obstructions to navigation differ from obstructions to navigable capacity. The former denotes the actual, present obstruction of navigation while the latter denotes the potential or capacity to obstruct navigation currently or in the future. Proof of the former requires a showing that navigation by specific vessels is presently obstructed while proof of the latter only requires a showing that a condition exists which would obstruct navigation over the waterway if it existed. In the latter case all that is required is proof of the condition which creates the obstruction which has a *substantial effect* on navigable capacity. (Our emphasis).

Section 401 regulates only several specific types of structures, i. e., any bridge, dam, dike or causeway. Therefore, unless the structure in the Yellow Creek embayment is found to be within one of these four categories, it is outside the scope of the statute. The evidence convinces us that the structure in the embayment area is clearly not a dike, not a dam, and not a causeway. Obviously, the land mass thus formed cannot be a bridge. A dam is commonly defined as a barrier preventing the flow of water. Webster's Third New International Dictionary; *Sierra Club, supra,* at 626–27. The term dike has been construed to mean "an embankment for controlling or holding back the waters of the sea or a river." *Citizens Comm. for the Hudson Valley v. Volpe,* 302 F.Supp. 1083, 1089 (S.D.N.Y. 1969), aff'd. 425 F.2d 97 (2 Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d

256; *Sierra Club, supra.* A causeway is defined as "a raised road across water or marshy land with the water or marshy land on both sides of the road." *Citizens Comm.,* etc., *supra,* at 1089. We conclude from the evidence that the land mass created in this small portion of the Yellow Creek embayment is, by definition, neither a bridge, dike, dam nor causeway. Its primary effect is not to obstruct but to promote navigation, and it is manifestly clear from the record that the structure does not substantially affect the navigable capacity of either the Pickwick Pool or the Yellow Creek.

With respect to the claim that five dams in the canal section were added without authority, the weight of the credible evidence is that the original plan which called for the placing of ten locks in the canal section would have also called for levees along most of the eastern side of the waterway which had the same effect as dams in that they formed barriers preventing the flow from the canal proper and over the eastern flood plain. Obviously, a sufficient volume of water must be provided for tows to lock through without reducing the water level above the lock. We find that the eastern levees in the original design were damming structures, and performing the same function as the damming structures in the current design, but were incapable of providing sufficient pool volume to accommodate the increased lifts upon elimination of five of the original ten locks in 1960. The only difference under the present plan is that the dimensions or lengths of the damming structures have been substantially diminished to achieve the same purpose as was contemplated in the original design. We have no hesitation in concluding that this change in plan does not constitute a § 401 violation.

### V.

Much has been said about the Corps' erroneous assumption that it had general statutory authority, under 33 U.S.C. § 5, to make navigation improvements to the BWT, which is a historically different navigation project extending southward from Demopo-

lis to Mobile. The BWT has been in operation for many years and antedates the 1946 authorization of the TTW. The fact is that the Corps, in the face of the 1974 *Callaway* decision, has readily acknowledged that it is without authority to eliminate the constraints presently existing in the BWT project and, after proper studies, must secure congressional approval to increase the channel width, eliminate numerous cutoffs, increase lockage capacity and remove other hindrances now existing in the BWT in order to efficiently accommodate 2-way navigation for 8-barge tows. Not only do the defendants concede the necessity for congressional approval for making these modifications to the existing BWT but they further acknowledge that, assuming the future grant of such authorization, the duty will rest upon them to comply with NEPA and all other applicable laws before such navigation improvements could be made. Suffice it to say that these developments, though of recent origin, have no bearing upon the Corps' lawful prosecution of the TTW project in accordance with the current design.

Let an order issue accordingly.